MAPP, etc., Appellant, v. OHIO.

United States Supreme Court.

No. 236.   Decided June 19, 1961.

Mr. Justice Clark delivered the opinion of the Court.

Appellant stands convicted of knowingly having had in her possession and under her control certain lewd and lascivious books, pictures, and photographs in violation of Section 2905.34, Revised Code.[1] As officially stated in the syllabus to its opinion, the Supreme Court of Ohio found that her conviction was valid though "based primarily upon the introduction in evidence of lewd and lascivious books and pictures unlawfully seized during an unlawful search of defendant's home. . . ."  170 Ohio St., 427-428, 166 N. E. 2d, 387, 388.

On May 23, 1957, three Cleveland police officers arrived at appellant's residence in that city pursuant to information that "a person [was] hiding out in the home who was wanted for questioning in connection with a recent bombing, and that there was a large amount of policy paraphernalia being hidden

---

1. The statute provides in pertinent part that

"No person shall knowingly . . . have in his possession or under his control an obscene, lewd, or lascivious book [or] . . . picture. . . .

"Whoever violates this section shall be fined not less than two hundred nor more than two thousand dollars or imprisoned not less than one nor more than seven years, or both."

in the home." Miss Mapp and her daughter by a former marriage lived on the top floor of the two-family dwelling. Upon their arrival at that house, the officers knocked on the door and demanded entrance but appellant, after telephoning her attorney, refused to admit them without a search warrant. They advised their headquarters of the situation and undertook a surveillance of the house.

The officers again sought entrance some three hours later when four or more additional officers arrived on the scene. When Miss Mapp did not come to the door immediately, at least one of the several doors to the house was forcibly opened[2] and the policemen gained admittance. Meanwhile Miss Mapp's attorney arrived, but the officers, having secured their own entry, and continuing in their defiance of the law, would permit him neither to see Miss Mapp nor to enter the house. It appears that Miss Mapp was halfway down the stairs from the upper floor to the front door when the officers, in this highhanded manner, broke into the hall. She demanded to see the search warrant. A paper, claimed to be a warrant, was held up by one of the officers. She grabbed the "warrant" and placed it in her bosom. A struggle ensued in which the officers recovered the piece of paper and as a result of which they handcuffed appellant because she has been "belligerent" in resisting their official rescue of the "warrant" from her person. Running roughshod over appellant, a policeman "grabbed" her, "twisted [her] hand," and she "yelled [and] pleaded with him" because "it was hurting." Appellant, in handcuffs, was then forcibly taken upstairs to her bedroom where the officers searched a dresser, a chest of drawers, a closet and some suitcases. They also looked into a photo album and through personal papers belonging to the appellant. The search spread to the rest of the second floor including the child's bedroom, the living room, the kitchen and a dinette. The basement of the building and a trunk found therein were also searched. The

---

2. A police officer testified that "we did pry the screen door to gain entrance"; the attorney on the scene testified that a policeman "tried to kick in the door" and then "broke the glass in the door and somebody reached in and opened the door and let them in;" the appellant testified that "the back door was broken."

obscene materials for possession of which she was ultimately convicted were discovered in the course of that widespread search.

At the trial no search warrant was produced by the prosecution, nor was the failure to produce one explained or accounted for. At best, "there is, in the record, considerable doubt as to whether there ever was any warrant for the search of defendant's home." 170 Ohio St., at 430, 166 N. E. 2d, at 389. The Ohio Supreme Court believed a "reasonable argument" could be made that the conviction should be reversed "because the 'methods' employed to obtain the [evidence] . . . were such as to offend 'a sense of justice,' " but the court found determinative the fact that the evidence had not been taken "from defendant's person by the use of brutal or offensive physical force against defendant." 170 Ohio St., at 431, 166 N. E. 2d, at 389-390.

The State says that even if the search were made without authority, or otherwise unreasonably, it is not prevented from using the unconstitutionally seized evidence at trial, citing *Wolf* v. *Colorado*, 338 U. S., 25 (1949), in which this Court did indeed hold "that in a prosecution in a State court for a State crime the Fourteenth Amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure." At p. 33. On this appeal, of which we have noted probable jurisdiction, 364 U. S., 868, it is urged once again that we review that holding.[3]

### I.

Seventy-five years ago, in *Boyd* v. *United States*, 116 U. S., 616, 630 (1886), considering the Fourth[4] and Fifth Amend-

---

3. Other issues have been raised on this appeal but, in the view we have taken of the case, they need not be decided. Although appellant chose to urge what may have appeared to be the surer ground for favorable disposition and did not insist that *Wolf* be overruled, the *amicus curiae*, who was also permitted to participate in the oral argument, did urge the Court to overrule *Wolf*.

4. "The right of the people to be secure in their persons, houses, not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

ments as running "almost into each other"[5] on the facts before it, this Court held· that the doctrines of those Amendments

"apply to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty and private property . . . . Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation . . . [of those Amendments]."

The Court noted that

"constitutional provisions for the security of person and property should be liberally construed. . . . It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." At p. 635.

In this jealous regard for maintaining the integrity of individual rights the Court gave life to Madison's prediction that "independent tribunals of justice . . . will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights." I Annals of Cong. 439 (1789). Concluding, the Court specifically referred to the use of the evidence there seized as "unconstitutional." At p. 638.

Less than 30 years after *Boyd*, this Court, in *Weeks* v. *United States*, 232 U. S., 383 (1914), stated that

"the Fourth Amendment . . . put the courts of the United States and Federal officials, in the exercise of their power and

---

5. The close connection between the concepts later embodied in these two Amendments had been noted at least as early as 1765 by Lord Camden, on whose opinion in *Entick* v. *Carrington*, 19 Howell's State Trials, col. 1029, the *Boyd* court drew heavily. Lord Camden had noted, at col. 1073:

"It is very certain, that the law obligeth no man to accuse himself; because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust; and it should seem, that search for evidence is disallowed upon the same principle. There too the innocent would be confounded with the guilty."

authority, under limitations and restraints [and] . . . forever secure[d] the people, their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law . . . and the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws." At pp. 391-392.

Specifically dealing with the use of the evidence unconstitutionally seized, the Court concluded:

"If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution. The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land." At p. 393.

Finally, the Court in that case clearly stated that use of the seized evidence involved "a denial of the constitutional rights of the accused." At p. 398. Thus, in the year 1914, in the *Weeks case*, this Court "for the first time" held that "in a federal prosecution the Fourth Amendment barred the use of evidence secured through an illegal search and seizure." *Wolf* v. *Colorado, supra,* at 28. This Court has ever since required of federal law officers a strict adherence to that command which this Court has held to be a clear, specific, and constitutionally required—even if judicially implied—deterrent safeguard without insistence upon which the Fourth Amendment would have been reduced to "a form of words." Holmes, J., *Silverthorne Lumber Co.* v. *United States,* 251 U. S., 385, 392 (1920). It meant, quite simply, that "conviction by means of unlawful seizures and enforced confessions . . . should find no sanction in the judgments of the courts. . . ." *Weeks* v. *United States, supra,* at 392, and that such evidence "shall not be used at all." *Silverthorne Lumber Co.* v. *United States, supra,* at 392.

There are in the cases of this Court some passing references

to the *Weeks* rule as being one of evidence. But the plain and unequivocal language of *Weeks*—and its later paraphrase in *Wolf*—to the effect that the *Weeks* rule is of constitutional origin, remains entirely undisturbed. In *Byars* v. *United States*, 273 U. S., 28 (1927), a unanimous Court declared that "the doctrine [cannot] . . . be tolerated *under our constitutional system*, that evidences of crime discovered by a federal officer in making a search without lawful warrant may be used against the victim of the unlawful search where a timely challenge has been interposed." At pp. 29-30 (emphasis added). The Court, in *Olmstead* v. *United States*, 277 U. S., 438 (1928), in unmistakable language restated the *Weeks* rule:

"The striking outcome of the *Weeks case* and those which followed it was the sweeping declaration that the Fourth Amendment, although not referring to or limiting the use of evidence in courts, really forbade its introduction if obtained by government officers through a violation of the Amendment." At p. 462.

In *McNabb* v. *United States*, 318 U. S., 332 (1943), we note this statement:

"[A] conviction in the federal courts, the foundation of which is evidence obtained in disregard of liberties deemed fundamental by the Constitution, cannot stand. . . . *Boyd* v. *United States* . . . *Weeks* v. *United States* . . . . And this Court has, on Constitutional grounds, set aside convictions, both in the federal and state courts, which were based upon confessions 'secured by protracted and repeated questioning of ignorant and untutored persons, in whose minds the power of officers was greatly magnified' . . . or 'who have been unlawfully held incommunicado without advice of friends or counsel' . . . ." At pp. 339-340.

Significantly, in *McNabb*, the Court did then pass on to formulate a rule of evidence, saying, "[i]n the view we take of the case, however, it becomes unnecessary to reach the Constitutional issue [for] . . . [t]he principles governing the admissibility of evidence in federal criminal trials have not been restricted . . . to those derived solely from the Constitution." At pp. 340-341.

## II.

In 1949, 35 years after *Weeks* was announced, this Court,

in *Wolf* v. *Colorado, supra*, again for the first time,[6] discussed the effect of the Fourth Amendment upon the States through the operation of the Due Process Clause of the Fourteenth Amendment. It said:

"[W]e have no hesitation in saying that were a State affirmatively to sanction such police incursion into privacy it would run counter to the guaranty of the Fourteenth Amendment." At p. 28.

Nevertheless, after declaring that the "security of one's privacy against arbitrary intrusion by the police" is "implicit in the 'concept of ordered liberty' and as such enforceable against the States through the Due Process Clause," cf. *Palko* v. *Connecticut*, 302 U. S., 319 (1937), and announcing that it "stoutly adhere[d]" to the *Weeks* decision, the Court decided that the *Weeks* exclusionary rule would not then be imposed upon the States as "an essential ingredient of the right." 338 U. S., at 27-29. The Court's reasons for not considering essential to the right to privacy, as a curb imposed upon the States by the Due Process Clause, that which decades before had been posited as part and parcel of the Fourth Amendment's limitation upon federal encroachment of individual privacy, were bottomed on factual considerations.

While they are not basically relevant to a decision that the exclusionary rule is an essential ingredient of the Fourth Amendment as the right it embodies is vouchsafed against the States by the Due Process Clause, we will consider the current validity of the factual grounds upon which *Wolf* was based.

The Court in *Wolf* first stated that "[t]he contrariety of views of the States" on the adoption of the exclusionary rule of *Weeks* was "particularly impressive" (at p. 29); and, in this connection, that it could not "brush aside the experience of States which deem the incidence of such conduct by the police too slight to call for a deterrent remedy . . . by overriding the [States'] relevant rules of evidence." At pp. 31-32. While in 1949, prior to the *Wolf case*, almost two-thirds of the States were opposed to the use of the exclusionary rule, now, despite the *Wolf case*, more than half of those since passing upon it, by

---

6. See, however, *National Safe Deposit Co.* v. *Stead*, 232 U. S., 58 (1914), and *Adams* v. *New York*, 192 U. S., 585 (1904).

their own legislative or judicial decision, have wholly or partly adopted or adhered to the *Weeks* rule. See *Elkins* v. *United States*, 364 U. S., 206, Appendix, pp. 224-232 (1960). Significantly, among those now following the rule is California which, according to its highest court, was "compelled to, reach that conclusion because other remedies have completely failed to secure compliance with the constitutional provisions. . . ." *People* v. *Cahan*, 44 Cal. 2d, 434, 445, 282 P. 2d, 905, 911 (1955). In connection with this California case, we note that the second basis elaborated in *Wolf* in support of its failure to enforce the exclusionary doctrine against the States was that "other means of protection" have been afforded "the right to privacy." 338

---

7. Less than half of the States have any criminal provisions relating directly to unreasonable searches and seizures. The punitive sanctions of the 23 States attempting to control such invasions of the right of privacy may be classified as follows:

*Criminal Liability of Affiant for Malicious Procurement of Search Warrant.*—Ala. Code, 1958, Tit. 15, §99; Alaska Comp. Laws Ann., 1949, §66-7-15; Ariz. Rev. Stat. Ann., 1956, §13-1454; Cal. Pen. Code §170; Fla Stat., 1959, §933.16; Ga. Code Ann., 1953. §27-301; Idaho Code Ann., 1948, §18-709; Iowa Code Ann., 1950, §751.38; Minn. Stat. Ann., 1947, §613.54; Mont. Rev. Codes Ann., 1947, §94-35-122; Nev. Rev. Stat. §§199.130, 199.140; N. J. Stat. Ann., 1940, §33:1-64; N. Y. Pen. Law §1786, N. Y. Code Crim. Proc. §811; N. C. Gen. Stat., 1953, §15-27 (applies to "officers" only); N. D. Century Code Ann., 1960, §§12-17-08, 29-29-18; Okla. Stat., 1951, Tit. 21, §585, Tit. 22, §1239; Ore. Rev. Stat. §141.990; S. D. Code, 1939 (Supp. 1960), §34.9904; Utah Code Ann., 1953, §77-54-21.

*Criminal Liability of Magistrate Issuing Warrant Without Supporting Affidavit.*—N. C. Gen. Stat., 1953, §15-27; Va. Code Ann., 1960 Replacement Volume, §19.1-89.

*Criminal Liability of Officer Willfully Exceeding Authority of Search Warrant.*—Fla. Stat. Ann., 1944, §933.17; Iowa Code Ann., 1950, §751.39; Minn. Stat. Ann., 1950, §613.54; Nev. Rev. Stat. §199.450; N. Y. Pen. Law §1847, N. Y. Code Crim. Proc. §812; N. D. Century Code Ann., 1960, §§12-17-07, 29-29-19; Okla. Stat., 1951, Tit. 21, §536, Tit. 22, §1240; S. D. Code, 1939 (Supp. 1960), §34.9905; Tenn Code Ann. 1955, §40-510; Utah Code Ann., 1953, §77-54-22.

*Criminal Liability of Officer for Search with Invalid Warrant or no Warrant.*—Idaho Code Ann., 1948, §18-703; Minn. Stat. Ann., 1947, §§613.53, 621.17; Mo. Ann. Stat., 1953, §558.190; Mont. Rev. Codes Ann., 1947, §94-3506; N. J. Stat. Ann, 1940, §33:1-65; N. Y. Pen. Law §1846; N. D. Century Code Ann., 1960, §12-17-06; Okla. Stat. Ann., 1958, Tit. 21, §535; Utah Code Ann., 1953, §76-28-52; Va. Code Ann., 1960 Replacement Volume, §19-1-88; Wash. Rev. Code §§10.79.040, 10.79.045.

U. S., at 30. The experience of California that such other remedies have been worthless and futile is buttressed by the experience of other States. The obvious futility of relegating the Fourth Amendment to the protection of other remedies has, moreover, been recognized by this Court since *Wolf*. See *Irvine* v. *California*, 347 U. S., 128, 137 (1954).

Likewise, time has set its face against what *Wolf* called the "weighty testimony" of *People* v. *Defore*, 242 N. Y., 13, 150 N. E., 585 (1926). There Justice (then Judge) Cardozo, rejecting adoption of the *Weeks* exclusionary rule in New York, had said that "[t]he Federal rule as it stands is either too strict or too lax." 242 N. Y., at 22, 150 N. E., at 588. However, the force of that reasoning has been largely vitiated by later decisions of this Court. These include the recent discarding of the "silver platter" doctrine which allowed federal judicial use of evidence seized in violation of the Constitution by state agents, *Elkins* v. *United States, supra*; the relaxation of the formerly strict requirements as to standing to challenge the use of evidence thus seized, so that now the procedure of exclusion, "ultimately referable to constitutional safeguards," is available to anyone even "legitimately on [the] premises" unlawfully searched, *Jones* v. *United States*, 362 U. S., 257, 266-267 (1960); and, finally, the formulation of a method to prevent state use of evidence unconstitutionally seized by federal agents, *Rea* v. *United States*, 350 U. S., 214 (1956). Because there can be no fixed formula, we admittedly met with "recurring questions of the reasonableness of searches," but less is not to be expected when dealing with a Constitution, and, at any rate, "[r]easonableness is in the first instance for the [trial court] . . . to determine." *United States* v. *Rabinowitz*, 339 U. S., 56, 63 (1950).

It, therefore, plainly appears that the factual considerations supporting the failure of the *Wolf* Court to include the *Weeks* exclusionary rule when it recognized the enforceability of the right to privacy against the States in 1949, while not basically relevant to the constitutional consideration, could not, in any analysis, now be deemed controlling.

### III.

Some five years after *Wolf*, in answer to a plea made here Term after Term that we overturn its doctrine on applicability

of the *Weeks* exclusionary rule, this Court indicated that such should not be done until the States had "adequate opportunity to adopt or reject the [*Weeks*] rule." *Irvine* v. *California, supra,* at 134. There again it was said:

"Never until June of 1949 did this Court hold the basic search-and-seizure prohibition in any way applicable to the states under the Fourteenth Amendment." *Ibid.*

And only last Term, after again carefully re-examining the *Wolf* doctrine in *Elkins* v. *United States, supra,* the Court pointed out that "the controlling principles" as to search and seizure and the problem of admissibility "seemed clear" (at p. 212) until the announcement in *Wolf* "that the Due Process Clause of the Fourteenth Amendment does not itself require state courts to adopt the exclusionary rule" of the *Weeks case.* At p. 213. At the same time the Court pointed out, "the underlying constitutional doctrine which *Wolf* established . . . that the Federal Constitution . . . prohibits unreasonable searches and seizures by state officers" had undermined the "foundation upon which the admissibility of state-seized evidence in a federal trial originally rested . . . ." *Ibid.* The Court concluded that it was therefore obliged to hold, although it chose the narrower ground on which to do so, that all evidence obtained by an unconstitutional search and seizure was inadmissible in a federal court regardless of its source. Today we once again examine *Wolf's* constitutional documentation of the right to privacy free from unreasonable state intrusion, and, after its dozen years on our books, are led by it to close the only courtroom door remaining open to evidence secured by official lawlessness in flagrant abuse of that basic right, reserved to all persons as a specific guarantee against that very same unlawful conduct. We hold that all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court.

IV.

Since the Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth, it is enforceable against them by the same sanction of exclusion as is used against the Federal Government. Were it otherwise, then just as without the *Weeks* rule the assurance against unreasonable federal searches and

seizures would be "a form of words," valueless and undeserving of mention in a perpetual charter of inestimable human liberties, so too, without that rule the freedom from state invasions of privacy would be so ephermeral and so neatly severed from its conceptual nexus with the freedom from all brutish means of coercing evidence as not to merit this Court's high regard as a freedom "implicit in the concept of ordered liberty." At the time that the Court held in *Wolf* that the Amendment was applicable to the States through the Due Process Clause, the cases of this Court, as we have seen, had steadfastly held that as to federal officers the Fourth Amendment included the exclusion of the evidence seized in violation of its provisions. Even *Wolf* "stoutly adhered" to that proposition. The right to privacy, when conceded operatively enforceable against the States, was not susceptible of destruction by avulsion of the sanction upon which its protection and enjoyment had always been deemed dependent under the *Boyd, Weeks* and *Silverthorne cases.* Therefore, in extending the substantive protections of due process to all constitutionally unreasonable searches—state or federal—it was logically and constitutionally necessary that the exclusion doctrine—an essential part of the right to privacy —be also insisted upon as an essential ingredient of the right newly recognized by the *Wolf case.* In short, the admission of the new constitutional right by *Wolf* could not consistently tolerate denial of its most important constitutional privilege, namely, the exclusion of the evidence which an accused had been forced to give by reason of the unlawful seizure. To hold otherwise is to grant the right but in realty to withhold its privilege and enjoyment. Only last year the Court itself recognized that the purpose of the exclusionary rule "is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins* v. *United States, supra,* at 217.

Indeed, we are aware of no restraint, similar to that rejected today, conditioning the enforcement of any other basic constitutional right. The right to privacy, no less important than any other right carefully and particularly reserved to the people, would stand in marked contrast to all other rights declared as "basic to a free society." *Wolf* v. *Colorado, supra,* at 27. This Court has not hesitated to enforce as strictly against

the States as it does against the Federal Government the rights of free speech and of a free press, the rights to notice and to a fair, public trial, including, as it does, the right not to be convicted by use of a coerced confession, however logically relevant it be, and without regard to its reliability. *Rogers* v. *Richmond*, 365 U. S., 534 (1961). And nothing could be more certain than that when a coerced confession is involved, "the relevant rules of evidence" are overridden without regard to "the incidence of such conduct by the police," slight or frequent. Why should not the same rule apply to what is tantamount to coerced testimony by way of unconstitutional seizure of goods, papers, effects, documents, etc? We find that, as to the Federal Government, the Fourth and Fifth Amendments and, as to the States, the freedom from unconscionable invasions of privacy and the freedom from convictions based upon coerced confessions do enjoy an "intimate relation"[8] in their perpetuation of "principles of humanity and civil liberty [secured] . . . only after years of struggle," *Bram* v. *United States*, 168 U. S., 532, 543-544 (1897). They express "supplementing phases of the same constitutional purpose—to maintain inviolate large areas of personal privacy." *Feldman* v. *United States*, 322 U. S., 487, 489-490 (1944). The philosophy of each Amendment and of each freedom is complementary to, although not dependent upon, that of the other in its sphere of influence—the very least that together they assure in either sphere is that no man is to be convicted on unconstitutional evidence. Cf. *Rochin* v. *California*, 342 U. S., 165, 173 (1952).

## V.

Moreover, our holding that the exclusionary rule is an essential part of both the Fourth and Fourteenth Amendments is not only the logical dictate of prior cases, but it also makes very good sense. There is no war between the Constitution and common sense. Presently, a federal prosecutor may make no use of evidence illegally seized, but a State's attorney across the street may, although he supposedly is operating under the enforceable prohibitions of the same Amendment. Thus the

---

8. But compare *Waley* v. *Johnston*, 316 U. S., 101, 104, and *Chambers* v. *Florida*, 309 U. S., 227, 236, with *Weeks* v. *United States*, 232 U. S., 383, and *Wolf* v. *Colorado*, 338 U. S., 25.

State, by admitting evidence unlawfully seized, serves to encourage disobedience to the Federal Constitution which it is bound to uphold. Moreover, as was said in *Elkins,* "[t]he very essence of a healthy federalism depends upon the avoidance of needless conflict between state and federal courts." 364 U. S., at 221. Such a conflict, hereafter needless, arose this very Term, in *Wilson* v. *Schnettler,* 365 U. S., 381 (1961), in which, and in spite of the promise made by *Rea,* we gave full recognition to our practice in this regard by refusing to restrain a federal officer from testifying in a state court as to evidence unconstitutionally seized by him in the performance of his duties. Yet the double standard recognized until today hardly put such a thesis into practice. In nonexclusionary States, federal officers, being human, were by it invited to and did, as our cases indicate, step across the street to the State's attorney with their unconstitutionally seized evidence. Prosecution on the basis of that evidence was then had in a state court in utter disregard of the enforceable Fourth Amendment. If the fruits of an unconstitutional search had been inadmissible in both state and federal courts, this inducement to evasion would have been sooner eliminated. There would be no need to reconcile such cases as *Rea* and *Schnettler,* each pointing up the hazardous uncertainties of our heretofore ambivalent approach.

Federal-state cooperation in the solution of crime under constitutional standards will be promoted, if only by recognition of their now mutual obligation to respect the same fundamental criteria in their approaches. "However much in a particular case insistence upon such rules may appear as a technicality that inures to the benefit of a guilty person, the history of the criminal law proves that tolerance of shortcut methods in law enforcement impairs its enduring effectiveness." *Miller* v. *United States,* 357 U. S., 301, 313 (1958). Denying shortcuts to only one of two cooperating law enforcement agencies tends naturally to breed legitimate suspicion of "working arrangements" whose results are equally tainted. *Byars* v. *United States,* 273 U. S., 28 (1927); *Lustig* v. *United States,* 338 U. S., 74 (1949).

There are those who say, as did Justice (then Judge) Cardozo, that under our constitutional exclusionary doctrine "[t]he criminal is to go free because the constable has blund-

ered." *People* v. *Defore*, 242 N. Y., at 21, 150 N. E., at 587. In some cases this will undoubtedly be the result.[9] But, as was said in *Elkins*, "there is another consideration—the imperative of judicial integrity." 364 U. S., at 222. The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence. As Mr. Justice Brandeis, dissenting, said in *Olmstead* v. *United States*, 277 U. S., 438, 485 (1928): "Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. . . . If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." Nor can it lightly be assumed that, as a practical matter, adoption of the exclusionary rule fetters law enforcement. Only last year this Court expressly considered that contention and found that "pragmatic evidence of a sort" to the contrary was not wanting. *Elkins* v. *United States, supra*, at 218. The Court noted that

"The federal courts themselves have operated under the exclusionary rule of *Weeks* for almost half a century; yet it has not been suggested either that the Federal Bureau of Investigation[10] has thereby been rendered ineffective, or that the administration of criminal justice in the federal courts has thereby been disrupted. Moreover, the experience of the states is impressive. . . . The movement toward the rule of exclusion has been halting but seemingly inexorable." *Id.*, at 218-219.

The ignoble shortcut to conviction left open to the State

---

9. As is always the case, however, state procedural requirements governing assertion and pursuance of direct and collateral constitutional challenges to criminal prosecutions must be respected. We note, moreover, that the class of state convictions possibly affected by this decision is of relatively narrow compass when compared with *Burns* v. *Ohio*, 360 U. S., 252; *Griffin* v. *Illinois*, 351 U. S., 12, and *Herman* v. *Claudy*, 350 U. S., 116. In those cases the same contention was urged and later proved unfounded. In any case, further delay in reaching the present result could have no effect other than to compound the difficulties.

10. See the remarks of Mr. Hoover, Director of the Federal Bureau of Investigation, FBI Law Enforcement Bulletin, September, 1952, pp. 1-2, quoted in *Elkins* v. *United States*, 364 U. S., 206, 218-219, note 8.

tends to destroy the entire system of constitutional restraints on which the liberties of the people rest." Having once recognized that the right to privacy embodied in the Fourth Amendment is enforceable against the States, and that the right to be secure against rude invasions of privacy by state officers is, therefore, constitutional in origin, we can no longer permit that right to remain an empty promise. Because it is enforceable in the same manner and to like effect as other basic rights secured by the Due Process Clause, we can no longer permit it to be revocable at the whim of any police officer who, in the name of law enforcement itself, chooses to suspend its enjoyment. Our decision, founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice.

The judgment of the Supreme Court of Ohio is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

MR. JUSTICE BLACK, concurring.

For nearly fifty years, since the decision of this Court in *Weeks* v. *United States*,[1] federal courts have refused to permit the introduction into evidence against an accused of his papers and effects obtained by "unreasonable searches and seizures" in violation of the Fourth Amendment. In *Wolf* v. *Colorado*, decided in 1948, however, this Court held that "in a prosecution in a State court for a State crime the Fourteenth Amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure."[2] I concurred in that holding on these grounds:

"For reasons stated in my dissenting opinion in *Adamson* v. *California*, 332 U. S., 46, 68, I agree with the conclusion of the Court that the Fourth Amendment's prohibition of 'unreasonable searches and seizures' is enforceable against the states.

---

11. Cf. *Marcus* v. *Search Warrants, ante,* p. .

1. 232 U. S., 383, decided in 1914.

2. 338 U. S., 25, 33.

Consequently, I should be for reversal of this case if I thought the Fourth Amendment not only prohibited 'unreasonable searches and seizures,' but also, of itself, barred the use of evidence so unlawfully obtained. But I agree with what appears to be a plain implication of the Court's opinion that the federal exclusionary rule is not a command of the Fourth Amendment but is a judicially created rule of evidence which Congress might negate.'"[3]

I am still not persuaded that the Fourth Amendment, standing alone, would be enough to bar the introduction into evidence against an accused of papers and effects seized from him in violation of its commands. For the Fourth Amendment does not itself contain any provision expressly precluding the use of such evidence, and I am extremely doubtful that such a provision could properly be inferred from nothing more than the basic command against unreasonable searches and seizures. Reflection on the problem, however, in the light of cases coming before the Court since *Wolf*, has led me to conclude that when the Fourth Amendment's ban against unreasonable searches and seizures is considered together with the Fifth Amendment's ban against compelled self-incrimination, a constitutional basis emerges which not only justifies but actually requires the exclusionary rule.

The close interrelationship between the Fourth and Fifth Amendments, as they apply to this problem,[4] has long been recognized and, indeed, was expressly made the ground for this Court's holding in *Boyd* v. *United States*.[5] There the Court fully discussed this relationship and declared itself "unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself.'"[6] It was upon this ground that Mr. Justice Rutledge largely re-

---

3. *Id.*, at 39-40.

4. The interrelationship between the Fourth and the Fifth Amendments in this area does not, of course, justify a narrowing in the interpretation of either of these Amendments with respect to areas in which they operate separately. See *Feldman* v. *United States*, 322 U. S., 487, 502-503 (dissenting opinion); *Frank* v. *Maryland*, 359 U. S., 360, 374-384 (dissenting opinion).

5. 116 U. S., 616.

6. *Id.*, at 633.

lied in his dissenting opinion in the *Wolf case*.[7] And, although I rejected the argument at that time, its force has, for me at least, become compelling with the more thorough understanding of the problem brought on by recent cases. In the final analysis, it seems to me that the *Boyd* doctrine, though perhaps not required by the express language of the Constitution strictly construed, is amply justified from an historical standpoint, soundly based in reason, and entirely consistent with what I regard to be the proper approach to interpretation of our Bill of Rights —an approach well set out by Mr. Justice Bradley in the *Boyd* case:

"[C]onstitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."[8]

The case of *Rochin* v. *California*,[9] which we decided three years after the *Wolf case*, authenticated, I think, the soundness of Mr. Justice Bradley's and Mr. Justice Rutledge's reliance upon the interrelationship between the Fourth and Fifth Amendments as requiring the exclusion of unconstitutionally seized evidence. In the *Rochin case*, three police officers, acting with neither a judicial warrant nor probable cause, entered Rochin's home for the purpose of conducting a search and broke down the door to a bedroom occupied by Rochin and his wife. Upon their entry into the room, the officers saw Rochin pick up and swallow

7. 338 U. S., at 47-48.

8. 116 U. S., at 635. As the Court points out, Mr. Justice Bradley's approach to interpretation of the Bill of Rights stemmed directly from the spirit in which that great charter of liberty was offered for adoption on the floor of the House of Representatives by its framer, James Madison: "If they [the first ten Amendments] are incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights." I Annals of Congress, 439 (1789).

9. 342 U. S., 165.

two small capsules. They immediately seized him and took him in handcuffs to a hospital where the capsules were recovered by use of a stomach pump. Investigation showed that the capsules contained morphine and evidence of that fact was made the basis of his conviction of a crime in a state court.

When the question of the validity of that conviction was brought here, we were presented with an almost perfect example of the interrelationship between the Fourth and Fifth Amendments. Indeed, every member of this Court who participated in the decision of that case recognized this interrelationship and relied on it, to some extent at least, as justifying reversal of Rochin's conviction. The majority, though careful not to mention the Fifth Amendment's provision that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," showed at least that it was not unaware that such a provision exists, stating: "Coerced confessions offend the community's sense of fair play and decency. . . . It would be a stultification of the responsibility which the course of constitutional history has cast upon this Court to hold that in order to convict a man the police cannot extract by force what is in his mind but can extract what is in his stomach."[10] The methods used by the police thus were, according to the majority, "too close to the rack and the screw to permit of constitutional differentiation,"[11] and the case was reversed on the ground that these methods had violated the Due Process Clause of the Fourteenth Amendment in that the treatment accorded Rochin was of a kind that "shocks the conscience," "offend[s] 'a sense of justice' " and fails to "respect certain decencies of civilized conduct."[12]

I concurred in the reversal of the Rochin case, but on the ground that the Fourteenth Amendment made the Fifth Amendment's provision against self-incrimination applicable to the States and that, given a broad rather than a narrow construction, that provision barred the introduction of this "capsule" evidence just as much as it would have forbidden the use of words Rochin might have been coerced to speak.[13] In reaching

10. *Id.*, at 173.
11. *Id.*, at 172.
12. *Id.*, at 172, 173.
13. *Id.*, at 174-177.

this conclusion I cited and relied on the *Boyd case*, the constitutional doctrine of which was, of course, necessary to my disposition of the case. At that time, however, these views were very definitely in the minority for only MR. JUSTICE DOUGLAS and I rejected the flexible and uncertain standards of the "shock-the-conscience test" used in the majority opinion.[14]

Two years after *Rochin*, in *Irvine* v. *California*,[15] we were again called upon to consider the validity of a conviction based on evidence which had been obtained in a manner clearly unconstitutional and arguably shocking to the conscience. The five opinions written by this Court in that case demonstrate the utter confusion and uncertainty that had been brought about by the *Wolf* and *Rochin* decisions. In concurring, MR. JUSTICE CLARK emphasized the unsatisfactory nature of the Court's "shock-the-conscience test," saying that this "test" "makes for such uncertainty and unpredictability that it would be impossible to foretell—other than by guesswork—just how brazen the invasion of the intimate privacies of one's home must be in order to shock itself into the protective arms of the Constitution. In truth, the practical result of this *ad hoc* approach is simply that when five Justices are sufficiently revolted by local police action, a conviction is overturned and a guilty man may go free."[16]

Only one thing emerged with complete clarity from the *Irvine case*—that is that seven Justices rejected the "shock-the conscience" constitutional standard enunciated in the *Wolf* and *Rochin cases*. But even this did not lessen the confusion in this area of the law because the continued existence of mutually inconsistent precedents together with the Court's inability to settle upon a majority opinion in the *Irvine case* left the situation at least as uncertain as it had been before. Finally, today, we clear up that uncertainty. As I understand the Court's opinion in this case, we again reject the confusing "shock-the-conscience" standard in the *Wolf* and *Rochin cases* and, instead, set aside this state conviction in reliance upon the pre-

---

14. For the dissent of MR. JUSTICE DOUGLAS see *id.*, at 177-179.

15. 347 U. S., 128.

16. *Id.*, at 138. See also *United States* v. *Rabinowitz*, 339 U. S., 56, 66-68 (dissenting opinion).

cise, intelligible and more predictable constitutional doctrine enunciated in the *Boyd case*. I fully agree with Mr. Justice Bradley's opinion that the two Amendments upon which the *Boyd* doctrine rests are of vital importance in our constitutional scheme of liberty and that both are entitled to a liberal rather than a niggardly interpretation. The courts of the country are entitled to know with as much certainty as possible what scope they cover. The Court's opinion, in my judgment, dissipates the doubt and uncertainty in this field of constitutional law and I am persuaded, for this and other reasons stated, to depart from my prior views, to accept the *Boyd* doctrine as controlling in this state case and to join the Court's judgment and opinion which are in accordance with that constitutional doctrine.

Mr. Justice Douglas, concurring.

Though I have joined the opinion of the Court, I add a few words. This criminal proceeding started with a lawless search and seizure. The police entered a home forcefully, and seized documents that were later used to convict the occupant of a crime.

She lives alone with her fifteen-year-old daughter in the second floor flat of a duplex in Cleveland. At about 1:30 in the afternoon of May 23, 1957, three policemen arrived at this house. They rang the bell, and the appellant, appearing at her window, asked them what they wanted. According to their later testimony, the policemen had come to the house on information from "a confidential source that there was a person hiding out in the home, who was wanted for questioning and in connection with a recent bombing."[1] To the appellant's question, however, they replied only that they wanted to question her and would not state the subject about which they wanted to talk.

The appellant, who had retained an attorney in connection with a pending civil matter, told the police she would call him to ask if she should let them in. On her attorney's advice, she

1. This "confidential source" told the police, in the same breath, that "there was a large amount of policy paraphernalia being hidden in the home."

told them she would let them in only when they produced a valid search warrant. For the next two and a half hours, the police laid siege to the house. At four o'clock, their number was increased to at least seven. Appellant's lawyer appeared on the scene; and one of the policemen told him that they now had a search warrant, but the officer refused to show it. Instead, going to the back door, the officer first tried to kick it in and, when that proved unsuccessful, he broke the glass in the door and opened it from the inside.

The appellant, who was on the steps going up to her flat, demanded to see the search warrant; but the officer refused to let her see it although he waved a paper in front of her face. She grabbed it and thrust it down the front of her dress. The policemen seized her, took the paper from her, and had her handcuffed to another officer. She was taken upstairs, thus bound, and into the larger of the two bedrooms in the apartment; there she was forced to sit on the bed. Meanwhile, the officers entered the house and made a complete search of the four rooms of her flat and of the basement of the house.

The testimony concerning the search is largely nonconflicting. The approach of the officers; their long wait outside the home, watching all its doors; the arrival of reinforcements armed with a paper;[2] breaking into the house; putting their hands on appellant and handcuffing her; numerous officers ransacking through every room and piece of furniture, while the appellant sat, a prisoner in her own bedroom. There is direct conflict in the testimony, however, as to where the evidence which is the basis of this case was found. To understand the meaning of that conflict, one must understand that this case is based on the knowing possession[3] of four little pamphlets, a couple

---

2. The purported warrant has disappeared from the case. The State made no attempt to prove its existence, issuance or contents, either at the trial or on the hearing of a preliminary motion to suppress. The Supreme Court of Ohio said: "There is, in the record, considerable doubt as to whether there ever was *any* warrant for the search of defendant's home. . . . Admittedly . . . there was no warrant authorizing a search . . . for any 'lewd, lascivious book . . . print, [or] picture.'" 170 Ohio St., 427, 430, 166 N. E. 2d, 387, 389. (Emphasis added.)

3. Ohio Rev. Code, §2905.35: "No person shall knowingly . . . have in his possession or under his control an obscene, lewd, or lascivious book,

of photographs and a little pencil doodle—all of which are alleged to be pornographic.

According to the police officers who participated in the search, these articles were found, some in appellant's dressers and some in a suitcase found by her bed. According to appellant, most of the articles were found in a cardboard box in the basement; one in the suitcase beside her bed. All of this material, appellant—and a friend of hers—said were odds and ends belonging to a recent boarder, a man who had left suddenly for New York and had been detained there. As the Supreme Court of Ohio read the statute under which appellant is charged, she is guilty of the crime whichever story is true.

The Ohio Supreme Court sustained the conviction even though it was based on the documents obtained in the lawless search. For in Ohio evidence obtained by an unlawful search and seizure is admissible in a criminal prosecution at least where it was not taken from the "defendant's person by the use of brutal or offensive force against defendant." *State* v. *Mapp*, 170 Ohio St., 427, syllabus 2; *State* v. *Lindway*, 131 Ohio St., 166. This evidence would have been inadmissible in a federal prosecution. *Weeks* v. *United States*, 232 U. S., 383; *Elkins* v. *United States*, 364 U. S., 206. For, as stated in the former decision, "The effect of the Fourth Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints. . . ." *Id.*, 391-392. It was therefore held that evidence obtained (which in that case was documents and correspondence) from a home without any warrant was not admissible in a federal prosecution.

We held in *Wolf* v. *Colorado*, 338 U. S., 25, that the Fourth Amendment was applicable to the states by reason of the Due Process Clause of the Fourteenth Amendment. But a majority held that the exclusionary rule of the *Weeks case* was not required of the States, that they could apply such sanctions as

magazine, pamphlet, paper, writing, advertisement, circular, print, picture . . . or drawing . . . of an indecent or immoral nature. . . . Whoever violates this section shall be fined not less than two hundred dollars nor more than two thousand dollars or imprisoned not less than one nor more than seven years, or both."

they chose. That position had the necessary votes to carry the day. But with all respect it was not the voice of reason or principle.

As stated in the *Weeks case,* if evidence seized in violation of the Fourth Amendment can be used against an accused "his right to be secure against such searches and seizures is of no value, and . . . might as well be stricken from the Constitution." 232 U. S., at 393.

When we allowed States to give constitutional sanction to the "shabby business" of unlawful entry into a home (to use an expression of Mr. Justice Murphy, *Wolf* v. *Colorado,* at 46), we did indeed rob the Fourth Amendment of much meaningful force. There are, of course, other theoretical remedies. One is disciplinary action within the hierarchy of the police system, including prosecution of the police officer for a crime. But as Mr. Justice Murphy said in *Wolf* v. *Colorado,* at 42, "Self-scrutiny is a lofty ideal but its exaltation reaches new heights if we expect a District Attorney to prosecute himself or his associates for well-meaning violations of the search and seizure clause during a raid the District Attorney or his associates have ordered."

The only remaining remedy, if exclusion of the evidence is not required, is an action of trespass by the homeowner against the offending officer. Mr. Justice Murphy showed how onerous and difficult it would be for the citizen to maintain that action and how meagre the relief even if the citizen prevails. 338 U. S., 42-44. The truth is that trespass actions against officers who make unlawful searches and seizures are mainly illusory remedies.

Without judicial action making the exclusionary rule applicable to the States, *Wolf* v. *Colorado* in practical effect reduced the guarantee against unreasonable searches and seizures to "a dead letter," as Mr. Justice Rutledge said in his dissent. See 338 U. S., at 47.

*Wolf* v. *Colorado, supra,* was decided in 1949. The immediate result was a storm of constitutional controversy which only today finds its end. I believe that this is an appropriate case in which to put an end to the asymmetry which *Wolf* imported into the law. See *Stefanelli* v. *Minard,* 342 U. S., 117; *Rea* v. *United States,* 350 U. S., 214; *Elkins* v. *United States,*

*supra; Monroe* v. *Pape,* 365 U. S., 167.   It is an appropriate case because the facts it presents show—as would few other cases— the casual arrogance of those who have the untrammelled power to invade one's home and to seize one's person.

It is also an appropriate case in the narrower and more technical sense.  The issues of the illegality of the search and the admissibility of the evidence have been presented to the state court and were duly raised here in accordance with the applicable Rule of Practice.[4]   The question was raised in the notice of appeal, the jurisdictional statement and in appellant's brief on the merits.[5]   It is true that argument was mostly directed to another issue in the case, but that is often the fact. See *Rogers* v. *Richmond,* 365 U. S., 534, 535-540.   Of course, an earnest advocate of a position always believes that, had he only an additional opportunity for argument, his side would win.   But, subject to the sound discretion of a court, all argument must at last come to a halt.   This is especially so as to an issue about which this Court said last year that "The arguments of its antagonists and of its proponents have been so many times marshalled as to require no lengthy elaboration here." *Elkins* v. *United States, supra,* 216.

Moreover, continuance of *Wolf* v. *Colorado* in its full vigor breeds the unseemly shopping around of the kind revealed in *Wilson* v. *Schnettler,* 365 U. S., 381.   Once evidence, inadmissible in a federal court, is admissible in a state court a "double standard" exists which, as the Court points out, leads to "working arrangements" that undercut federal policy and reduce some aspects of law enforcement to shabby business. · The rule that supports that practice does not have the force of reason behind it.

Memorandum of MR. JUSTICE STEWART.

Agreeing fully with Part I of MR. JUSTICE HARLAN's dis-

---

4. "The notice of appeal . . . shall set forth the questions presented by the appeal. . . .   Only the questions set forth in the notice of appeal or fairly comprised therein will be considered by the court."   Rule 10 (2) (c), Rules of the Supreme Court of the United States.

5. "Did the conduct of the police in procuring the books, papers and pictures placed in evidence by the Prosecution violate Amendment IV, Amendment V, and Amendment XIV Section 1 of the United States Constitution . . .?"

senting opinion, I express no view as to the merits of the constitutional issue which the Court today decides. I would, however, reverse the judgment in this case, because I am persuaded that the provision of Section 2905.34, Revised Code, upon which the petitioner's conviction was based, is, in the words of MR. JUSTICE HARLAN, not "consistent with the rights of free thought and expression assured against state action by the Fourteenth Amendment."

MR. JUSTICE HARLAN, whom MR. JUSTICE FRANKFURTER and MR. JUSTICE WHITTAKER join, dissenting.

In overruling the *Wolf* case the Court, in my opinion, has forgotten the sense of judicial restraint which, with due regard for *stare decisis*, is one element that should enter into deciding whether a past decision of this Court should be overruled. Apart from that I also believe that the *Wolf* rule represents sounder Constitutional doctrine than the new rule which now replaces it.

## I.

From the Court's statement of the case one would gather that the central, if not controlling, issue on this appeal is whether illegally state-seized evidence is Constitutionally admissible in a state prosecution, an issue which would of course face us with the need for re-examining *Wolf*. However, such is not the situation. For, although that question was indeed raised here and below among appellant's subordinate points, the new and pivotal issue brought to the Court by this appeal is whether Section 2905.34, Revised Code, making criminal the *mere* knowing possession or control of obscene material,[1] and under which appellant has been convicted, is consistent with the rights of free thought and expression assured against state action by the Fourteenth Amendment.[2] That was the principal issue which was decided by the Ohio Supreme Court,[3]

1. The material parts of that law are quoted in Note 1 of the Court's opinion. *Ante*, p.     .

2. In its Note 3, *ante*, p.     , the Court, it seems to me, has turned upside-down the relative importance of appellant's reliance on the various points made by him on this appeal.

3. See 170 Ohio St., 427. Because of the unusual provision of the Ohio Constitution requiring "the concurrence of at laest all but one of the

which was tendered by appellant's Jurisdictional Statement,[3] and which was briefed[5] and argued[6] in this Court.

In this posture of things, I think it fair to say that five members of this Court have simply "reached out" to overrule *Wolf*. With all respect for the views of the majority, and recognizing that *stare decisis* carries different weight in Constitutional adjudication than it does in nonconstitutional decision, I can perceive no justification for regarding this case as an appropriate occasion for re-examining *Wolf*.

The action of the Court finds no support in the rule that decision of Constitutional issues should be avoided wherever

---

judges" of the Ohio Supreme Court before a state law is held unconstitutional (except in the case of affirmance of a holding of unconstitutionality by the Ohio Court of Appeals), Ohio Const., Art. IV, §2, the State Supreme Court was compelled to uphold the constitutionality of §2905.34, despite the fact that four of its seven judges thought the statute offensive to the Fourteenth Amendment.

4. Respecting the "substantiality" of the federal questions tendered by this appeal, appellant's Jurisdictional Statement contained the following:

"The Federal questions raised by this appeal are substantial for the following reasons:

"The Ohio Statute under which the defendant was convicted violates one's sacred right to own and hold property, which has been held inviolate by the Federal Constitution. The right of the individual 'to read, to believe or disbelieve, and to think without governmental supervision is one of our basic liberties, but to dictate to the mature adult what books he may have in his own private library seems to be a clear infringement of the constitutional rights of the individual' (Justice Herbert's dissenting Opinion, Appendix 'A'). Many convictions have followed that of the defendant in the State Courts of Ohio based upon this very same statute. Unless this Honorable Court hears this matter and determines once and for all that the Statute is unconstitutional as defendant contends, there will be many such appeals. When Sections 2905.34, 2905.37 and 3767.01, Revised Code [the latter two Sections providing exceptions to the coverage of Section 2905.34, Revised Code, and related provisions of Ohio's obscenity statutes] are read together, . . . they obviously contravene the Federal and State constitutional provisions; by being convicted under the Statute involved herein, and in the manner in which she was convicted, Defendant-Appellant has been denied due process of law; a sentence of from one (1) to seven (7) years in a penal institution for alleged violation of this unconstitutional section of the Ohio Revised Code deprives the defendant of her right to liberty and the pursuit of happiness, contrary to the Federal and State constitutional provisions, for circumstances which she herself did not put in motion, and is a cruel and unusual punishment inflicted upon her contrary to the State and Federal Constitutions."

possible. For in overruling *Wolf* the Court, instead of passing upon the validity of Ohio's Section 2905.34, Revised Code, has simply chosen between two Constitutional questions. Moreover, I submit that it has chosen the more difficult and less appropriate of the two questions. The Ohio statute which, as construed by the State Supreme Court, punishes knowing possession or control of obscene material, irrespective of the purposes of such possession or control (with exceptions not here applicable)[7] and irrespective of whether the accused had any

5. The appellant's brief did not urge the overruling of *Wolf*. Indeed it did not even cite the case. The brief of the appellee merely relied on *Wolf* in support of the State's contention that appellant's conviction was not vitiated by the admission in evidence of the fruits of the alleged unlawful search and seizure by the police. The brief of the American and Ohio Civil Liberties Unions, as *amici*, did in one short concluding paragraph of its argument "request" the Court to re-examine and overrule *Wolf*, but without argumentation. I quote in full this part of their brief:

"This case presents the issue of whether evidence obtained in an illegal search and seizure can constitutionally be used in a State criminal proceeding. We are aware of the view that this Court has taken on this issue in *Wolf* v. *Colorado*, 338 U. S., 25. It is our purpose by this paragraph to respectfully request that this Court re-examine this issue and conclude that the ordered liberty concept guaranteed to persons by the due process clause of the Fourteenth Amendment necessarily requires that evidence illegally obtained in violation thereof, not be admissible in state criminal proceedings."

6. Counsel for appellant on oral argument, as in his brief, did not urge that *Wolf* be overruled. Indeed, when pressed by questioning from the bench whether he was not in fact urging us to overrule *Wolf*, counsel expressly disavowed any such purpose.

7. "2905.37 LEGITIMATE PUBLICATIONS NOT OBSCENE.

"Sections 2905.33 to 2905.36, inclusive, Revised Code, do not affect teaching in regularly chartered medical colleges, the publication of standard medical books, or regular practitioners of medicine or druggists in their legitimate business, nor do they affect the publication and distribution of bona fide works of art. No articles specified in Sections 2905.33, 2905.34 and 2905.36, Revised Code, shall be considered a work of art unless such article is made, published, and distributed by a bona fide association of artists or an association for the advancement of art whose demonstrated purpose does not contravene Sections 2905.06 to 2905.44, inclusive, Revised Code, and which is not organized for profit.

"3767.01 (C)

"This section and Sections 2905.34, . . . 2905.37 . . ., Revised Code, shall not affect . . . any newspaper, magazine, or other publication entered as second class matter by the post-office department."

reasonable opportunity to rid himself of the material after discovering that it was obscene,[9] surely presents a constitutional question which is both simpler and less far-reaching than the question which the Court decides today. It seems to me that justice might well have been done in this case without overturning a decision on which the administration of criminal law in many of the States has long justifiably relied.

Since the demands of the case before us do not require us to reach the question of the validity of *Wolf*, I think this case furnishes a singularly inappropriate occasion for reconsideration of that decision, if reconsideration is indeed warranted. Even the most cursory examination will reveal that the doctrine of the *Wolf case* has been of continuing importance in the administration of state criminal law. Indeed, certainly as regards its "nonexclusionary" aspect, *Wolf* did no more than articulate the then existing assumption among the States that the federal cases enforcing the exclusionary rule "do not bind [the States], for they construe provisions of the Federal Constitution, the Fourth and Fifth Amendments, not applicable to the States." *People* v. *Defore*, 242 N. Y., 13, 20. Though, of course, not reflecting the full measure of this continuing reliance, I find that during the last three Terms, for instance, the issue of the inadmissibility of illegally state-obtained evidence appears on an average of about fifteen times per Term just in the *in forma pauperis* cases summarily disposed of by us. This would indicate both that the issue which is now being decided may well have untoward practical ramifications respecting state cases long since disposed of in reliance on *Wolf*, and that were we determined to re-examine that doctrine we would not lack future opportunity.

The occasion which the Court has taken here is in the context of a case where the question was briefed not at all and argued only extremely tangentially. The unwisdom of overruling *Wolf* without full-dress argument is aggravated by the circumstance that that decision is a comparatively recent one

8. The Ohio Supreme Court, in its construction of Section 2905.34, Revised Code, controlling upon us here, refused to import into it any other exceptions than those expressly provided by the statute. See note 7, *supra*. Instead it held that "if anyone looks at a book and finds it lewd, he is forthwith, under this legislation, guilty. . . ."

(1949) to which three members of the present majority have at one time or other expressly subscribed, one to be sure with explicit misgivings.[9]  I would think that our obligation to the States, on whom we impose this new rule, as well as the obligation of orderly adherence to our own processes would demand that we seek that aid which adequate briefing and argument lends to the determination of an important issue.  It certainly has never been a postulate of judicial power that mere altered disposition, or subsequent membership on the Court, is sufficient warrant for overturning a deliberately decided rule of Constitutional law.

Thus, if the Court was bent on reconsidering *Wolf*, I think that there would soon have presented itself an appropriate opportunity in which we could have had the benefit of full briefing and argument.  In any event, at the very least, the present case should have been set down for reargument, in view of the inadequate briefing and argument we have received on the *Wolf* point.  To all intents and purposes the Court's present action amounts to a summary reversal of *Wolf*, without argument.

I am bound to say that what has been done is not likely to promote respect either for the Court's adjudicatory process or for the stability of its decisions.  Having been unable, however, to persuade any of the majority to a different procedural course, I now turn to the merits of the present decision.

## II.

Essential to the majority's argument against Wolf is the proposition that the rule of *Weeks* v. *United States*, 232 U. S., 383, excluding in federal criminal trials the use of evidence obtained in violation of the Fourth Amendment, derives not from the "supervisory power" of this Court over the federal judicial system, but from Constitutional requirement.  This is so because no one, I suppose, would suggest that this Court

---

9. See *Wolf* v. *Colorado*, 338 U. S., at 39-40; *Irvine* v. *California*, 347 U. S., 128, 133-134, and at 138-139.  In the latter case, decided in 1954, Mr. Justice Jackson, writing for the majority, said (at p. 134): "We think that the *Wolf* decision should not be overruled, for the reasons so persuasively stated therein."  Compare *Schwartz* v. *Texas*, 344 U. S., 199, and *Stefanelli* v. *Minard*, 342 U. S., 117, in which the *Wolf* case was discussed and in no way disapproved.  And see *Pugach* v. *Dollinger*, 365 U. S., 458, which relied on *Schwartz*.

possesses any general supervisory power over the state courts. Although I entertain considerable doubt as to the soundness of this foundational proposition of the majority, cf. *Wolf* v. *Colorado,* 338 U. S., at 39-40 (concurring opinion), I shall assume, for present purposes, that the *Weeks* rule "is of constitutional origin."

At the heart of the majority's opinion in this case is the following syllogism: (1) the rule excluding in federal criminal trials evidence which is the product of an illegal search and seizure is a "part and parcel" of the Fourth Amendment; (2) *Wolf* held that the "privacy" assured against federal action by the Fourth Amendment is also protected against state action by the Fourteenth Amendment; and (3) it is therefore "logically and constitutionally necessary" that the *Weeks* exclusionary rule should also be enforced against the States.[10]

This reasoning ultimately rests on the unsound premise that because *Wolf* carried into the States, as part of "the concept of ordered liberty" embodied in the Fourteenth Amendment, the principle of "privacy" underlying the Fourth Amendment (338 U. S., at 27), it must follow that whatever configurations of the Fourth Amendment have been developed in the particularizing federal precedents are likewise to be deemed a part of "ordered liberty," and as such are enforceable against the States. For me, this does not follow at all.

It cannot be too much emphasized that what was recognized in *Wolf* was not that the Fourth Amendment *as such* is enforceable against the States as a facet of due process, a view of the Fourteenth Amendment which, as *Wolf* itself pointed out (338 U. S., at 26), has long since been discredited, but the principle of privacy "which is at the core of the Fourth Amendment." (*Id.,* at 27.) It would not be proper to expect or impose any precise equivalence, either as regards the scope of the right or the means of its implementation, between the requirements of the Fourth and Fourteenth Amendments. For the Fourth, unlike what was said in *Wolf* of the Fourteenth, does not state a general principle only; it is a particular command, having its setting in a pre-existing legal context on

---

10. Actually, only four members of the majority support this reasoning. See, p. , *infra.*

which both interpreting decisions and enabling statutes must at least build.

Thus, even in a case which presented simply the question of whether a particular search and seizure was constitutionally "unreasonable"—say in a tort action against state officers—we would not be true to the Fourteenth Amendment were we merely to stretch the general principle of individual privacy on a Procrustean bed of federal precedents under the Fourth Amendment. But in this instance more than that is involved, for here we are reviewing not a determination that what the state police did was constitutionally permissible (since the state court quite evidently assumed that it was not), but a determination that appellant was properly found guilty of conduct which, for present purposes, it is to be assumed the State could constitutionally punish. Since there is not the slightest suggestion that Ohio's policy is "affirmatively to sanction . . . police incursion into privacy" (338 U. S., at 28), compare *Marcus* v. *Property Search Warrant*,     U. S.,     , what the Court is now doing is to impose upon the States not only federal substantive standards of "search and seizure" but also the basic federal remedy for violation of those standards. For I think it entirely clear that the *Weeks* exclusionary rule is but a remedy which, by penalizing past official misconduct, is aimed at deterring such conduct in the future.

I would not impose upon the States this federal exclusionary remedy. The reasons given by the majority for now suddenly turning its back on *Wolf* seem to me notably unconvincing.

First, it is said that "the factual grounds upon which *Wolf* was based" have since changed, in that more States now follow the *Weeks* exclusionary rule than was so at the time *Wolf* was decided. While that is true, a recent survey indicates that at present one half of the States still adhere to the common-law non-exclusionary rule, and one, Maryland, retains the rule as to felonies. Berman and Oberst, Admissibility of Evidence by an Unconstitutional Search and Seizure, 55 N. W. L. Rev., 525, 532-533. But in any case surely all this is beside the point, as the majority itself indeed seems to recognize. Our concern here, as it was in *Wolf*, is not with the desirability of that rule but only with the question whether the States are Constitu-

tionally free to follow it or not as they may themselves determine, and the relevance of the disparity of views among the States on this point lies simply in the fact that the judgment involved is a debatable one. Moreover, the very fact on which the majority relies, instead of lending support to what is now being done, points away from the need of replacing voluntary state action with federal compulsion.

The preservation of a proper balance between state and federal responsibility in the administration of criminal justice demands patience on the part of those who might like to see things move faster among the States in this respect. Problems of criminal law enforcement vary widely from State to State. One State, in considering the totality of its legal picture, may conclude that the need for embracing the *Weeks* rule is pressing because other remedies are unavailable or inadequate to secure compliance with the substantive Constitutional principle involved. Another, though equally solicitous of Constitutional rights, may choose to pursue one purpose at a time, allowing all evidence relevant to guilt to be brought into a criminal trial, and dealing with Constitutional infractions by other means. Still another may consider the exclusionary rule too rough and ready a remedy, in that it reaches only unconstitutional intrusions which eventuate in criminal prosecution of the victims. Further, a State after experimenting with the *Weeks* rule for a time may, because of unsatisfactory experience with it, decide to revert to a nonexclusionary rule. And so on. From the standpoint of Constitutional permissibility in pointing a State in one direction or another, I do not see at all why "time has set its face against" the considerations which led Mr. Justice Cardozo, then chief judge of the New York Court of Appeals, to reject for New York in *People* v. *Defore*, 242 N. Y., 13, the *Weeks* exclusionary rule. For us the question remains, as it has always been, one of state power, not one of passing judgment on the wisdom of one state course or another. In my view this Court should continue to forebear from fettering the States with an adamant rule which may embarrass them in coping with their own peculiar problems in criminal law enforcement.

Further, we are told that imposition of the *Weeks* rule on the States, makes "very good sense," in that it will promote recognition by state and federal officials of their "mutual obligation to respect the same fundamental criteria" in their approach to law enforcement, and will avoid " 'needless conflict between state and federal courts.' " Indeed the majority now finds an incongruity in *Wolf's* discriminating perception between the demands of "ordered liberty" as respects the basic right of "privacy" and the means of securing it among the States. That perception, resting both on a sensitive regard for our federal system and a sound recognition of this Court's remoteness from particular state problems, is for me the strength of that decision.

An approach which regards the issue as one of achieving procedural symmetry or of serving administrative convenience surely disfigures the boundaries of this Court's functions in relation to the state and federal courts. Our role in promulgating the *Weeks* rule and its extensions in such cases as *Rea, Elkins,* and *Rios*[11] was quite a different one than it is here. There, in implementing the Fourth Amendment, we occupied the position of a tribunal having the ultimate responsibility for developing the standards and procedures of judicial administration within the judicial system over which it presides. Here we review State procedures whose measure is to be taken not against the specific substantive commands of the Fourth Amendment but under the flexible contours of the Due Process Clause. I do not believe that the Fourteenth Amendment empowers this Court to mould state remedies effectuating the right to freedom from "arbitrary intrusion by the police" to suit its own notions of how things should be done, as, for instance the California Supreme Court did in *People* v. *Cahan*, 44 Cal. 2d, 434, with reference to procedures in the California courts or as this Court did in *Weeks* for the lower federal courts.

A state conviction comes to us as the complete product of a sovereign judicial system. Typically a case will have been tried in a trial court, tested in some final appellate court, and

---

11. *Rea* v. *United States*, 350 U. S., 214; *Elkins* v. *United States*, 364 U. S., 206; *Rios* v. *United States*, 364 U. S., 253.

will go no further. In the comparatively rare instance when a conviction is reviewed by us on due process grounds we deal then with a finished product in the creation of which we are allowed no hand, and our task, far from being one of overall supervision, is, speaking generally, restricted to a determination of whether the prosecution was constitutionally fair. The specifics of trial procedure, which in every mature legal system will vary greatly in detail, are within the sole competence of the States. I do not see how it can be said that a trial becomes unfair simply because a State determines that evidence may be considered by the trier of fact, regardless of how it was obtained, if it is relevant to the one issue with which the trial is concerned, the guilt or innocence of the accused. Of course, a court may use its procedures as an incidental means of pursuing other ends than the correct resolution of the controversies before it. Such indeed is the *Weeks* rule, but if a State does not choose to use its courts in this way, I do not believe that this Court is empowered to impose this much-debated procedure on local courts, however efficacious we may consider the *Weeks* rule to be as a means of securing Constitutional rights.

Finally, it is said that the overruling of *Wolf* is supported by the established doctrine that the admission in evidence of an involuntary confession renders a state conviction constitutionally invalid. Since such a confession may often be entirely reliable, and therefore of the greatest relevance to the issue of the trial, the argument continues, this doctrine is ample warrant in precedent that the way evidence was obtained, and not just its relevance, is constitutionally significant to the fairness of a trial. I believe this analogy is not a true one. The "coerced confession" rule is certainly not a rule that any illegally obtained statements may not be used in evidence. I would suppose that a statement which is procured during a period of illegal detention, *McNabb* v. *United States*, 318 U. S., 332, is, as much as unlawfully seized evidence, illegally obtained, but this Court has consistently refused to reverse state convictions resting on the use of such statements. Indeed it would seem the Court laid at rest the very argument now made by the majority when in *Lisenba* v. *California*, 314 U. S., 219, a state coerced confession case, it said (at 235):

"it may be assumed that [the] treatment of the petitioner

[by the police] . . . deprived him of his liberty without due process and that the petitioner would have been afforded preventive relief if he could have gained access to a court to seek it.

"But illegal acts, as such, committed in the course of obtaining a confession . . . do not furnish an answer to the constitutional question we must decide. . . . The gravamen of his complaint is the unfairness of the *use* of his confessions, and what occurred in their procurement is relevant only as it bears on that issue." (Emphasis supplied.)

The point, then, must be that in requiring exclusion of an involuntary statement of an accused, we are concerned not with an appropriate remedy for what the police have done, but with something which is regarded as going to the heart of our concepts of fairness in judicial procedure. The operative assumption of our procedural system is that "ours is the accusatorial as opposed to the inquisitorial system. Such has been the characteristic of Anglo-American criminal justice since it freed itself from practices borrowed by the Star Chamber from the continent whereby the accused was interrogated for hours on end." *Watts* v. *Indiana*, 338 U. S., 49, 54. See *Rogers* v. *Richmond*, 365 U. S., 534, 541. The pressures brought to bear against an accused leading to a confession, unlike an unconstitutional violation of privacy, do not, apart from the use of the confession at trial, necessarily involve independent Constitutional violations. What is crucial is that the trial defense to which an accused is entitled should not be rendered an empty formality by reason of statements wrung from him, for then "a prisoner . . . [has been] made the deluded instrument of his own conviction." 2 Hawkins, Pleas of the Crown (8th ed., 1824), c. 46, §34. That this is a *procedural right*, and that its violation occurs at the time his improperly obtained statement is admitted at trial, is manifest. For without this right all the careful safeguards erected around the giving of testimony, whether by an accused or any other witness, would become empty formalities in a procedure where the most compelling possible evidence of guilt, a confession, would have already been obtained at the unsupervised pleasure of the police.

This, and not the disciplining of the police, as with illegally seized evidence, is surely the true basis for excluding a state-

ment of the accused which was unconstitutionally obtained. In sum, I think the coerced confession analogy works strongly *against* what the Court does today.

In conclusion, it should be noted that the majority opinion in this case is in fact an opinion only for the *judgment* over-ruling *Wolf*, and not for the basic rationale by which four members of the majority have reached that result. For my Brother BLACK is unwilling to subscribe to their view that the *Weeks* exclusionary rule derives from the Fourth Amendment itself (see *ante,* p.    ), but joins the majority opinion on the premise that its end result can be achieved by bringing the Fifth Amendment to the aid of the Fourth (see *ante,* p.    ).[12] On that score I need only say that whatever the validity of the "Fourth-Fifth Amendment" correlation which the *Boyd case* (116 U. S., 616) found, see 8 Wigmore, Evidence (3d ed. 1940), §2184, we have only very recently again reiterated the long established doctrine of this Court that the Fifth Amendment privilege against self-incrimination is not applicable to the States. See *Cohen* v. *Hurley,*    U. S.,    .

I regret that I find so unwise in principle and so inexpedient in policy a decision motivated by the high purpose of increasing respect for Constitutional rights. But in the last analysis I think this Court can increase respect for the Constitution only if it rigidly respects the limitations which the Constitution places upon it, and respects as well the principles inherent in its own processes. In the present case I think we exceed both, and that our voice becomes only a voice of power, not of reason.

---

12. My Brother STEWART concurs in the Court's judgment on grounds which have nothing to do with *Wolf*.