## MICHAEL JOSEPH KELLY, JR. *v.* STATE OF MARYLAND

[No. 655, September Term, 1972.]

*Decided June 8, 1973.*

The cause was argued before ORTH, C. J., and MORTON and GILBERT, JJ.

*E. Thomas Maxwell, Jr.,* for appellant.

*Harry A. E. Taylor, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Raymond Thieme, State's Attorney for Anne Arundel County, Frank Weathersbee, Gerald Anders* and *Lynn Kromminga, Assistant State's Attorneys for Anne Arundel County,* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

Everyone agreed that MICHAEL JOSEPH KELLY, JR. was simply unlucky. One of the arresting officers said so in

barracks room language. His defense counsel made the point in arguing that he be acquitted. The trial judge so stated in convicting him. There was no element of luck, however, in the unlawful possession by Kelly of some 43 pounds of marihuana, and smaller quantities of the controlled dangerous substances amphetamine and pentobarbital, a barbituric acid. The *corpus delicti* of the crime of possessing this contraband and Kelly's criminal agency were established far beyond a reasonable doubt; in fact, the proof was to an absolute certainty with not even an attempt on his part to deny the possession. The trouble is the convictions were improperly attained. The contraband was unconstitutionally seized from Kelly by the authorities and should have been excluded from evidence. With its exclusion, the State has no case. In the ultimate, therefore, if Kelly's fate is to be evaluated in terms of luck, he is lucky, saved from punishment for breach of the law because of the exclusionary rule invoked by the Supreme Court for violation of the fourth amendment guarantee against an unreasonable search and seizure. *Mapp v. Ohio*, 367 U. S. 643.[1]

Why everyone felt that Kelly was unlucky was because he took United Airlines Flight 346 from Chicago to Friendship Airport on 25 July 1971. Agents of the Federal Bureau of Narcotics and Dangerous Drugs had set up a surveillance at Friendship to arrest one Frederick Crapper. Special Agent Jerry I. Rinehart had received information that morning from an Agent Jacobs, who had received it from other agents in Arizona, who had received it from the United States Customs Office there. Jacobs told Rinehart that "we had a white male individual coming into Friendship Airport with long brown hair, a college-type student, who was coming into Friendship from Chicago on Flight . . . 346 that morning." This individual was about 23 years of age and

---

1. The Court said, at 660:

"Our decision, founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice."

carrying two pieces of luggage, one green and one brown. The baggage ticket numbers were given. This information came from "a cooperating individual with the U. S. Customs", who had supplied information before leading to "I think five, six, seven times of prior convictions . . . all supposed to be good information." The surveillance was set up at 8:45 a.m., about an hour before Flight 346 was due. "We had a number of agents on the upper deck where the flight was coming in and then we had agents where I was stationed in the lower level where the baggage claim department was. The agents above were supposed to try to identify any male individual getting off of the airplane at that time. At this time they — when they got down to the lower level they identified two white male individuals that had fitted the description." [2] One of them was Kelly. The other turned out to be the man the agents were looking for, Frederick Crapper. Those two were the only ones on the plane generally fitting the description. Several of the agents followed Kelly. He took his baggage off the claim rack. Both bags were green. Crapper went upstairs.[3] Kelly, carrying his bags, went toward the exit. The agents arrested him and searched his luggage. The contraband was found in one of the bags and seized. Kelly was indicted and tried at a court trial in the Circuit Court for Anne Arundel County. He was convicted of possessing marihuana "in sufficient quantity to reasonably indicate under all circumstances an intent to unlawfully distribute" (1st count), possessing amphetamine (3rd count), and possessing barbituric acid, to wit, Pentobarbital (4th count). He was sentenced generally to a term of 2 years, the sentence was suspended and he was placed on probation upon conditions designated and payment of costs.

The circumstances leading to the seizure of the

---

**2.** Kelly "was dressed in a mod style type of dress, he had long brown hair, I think it was just about shoulder length, and . . . he had either a moustache or a beard, one."

**3.** Crapper took no bags off the claim rack. It was later determined that his bags "had apparently gotten mixed up and it didn't come in until another flight later that morning." He was arrested later that day when he claimed his baggage.

contraband as above set out were as recounted by Rinehart at a pretrial hearing on a motion to suppress the evidence on the ground of illegal search and seizure. Maryland Rule 729. The court below ruled that the warrantless arrest was legal as based on probable cause, and that the search and seizure incident thereto were therefore reasonable. See *Thompson v. State*, 15 Md. App. 335, 341. The court was wrong.

In the first place, the evidence adduced by the State, as it appears in the record before us, did not show that Crapper was committing a crime. We see nothing in the evidence in this case to establish that the information as received from the informant and transmitted ultimately to Rinehart was that Crapper was unlawfully transporting controlled dangerous substances or committing any other offense. This in itself would be fatal to a showing of probable cause for the arrest, but even aside from that, and, assuming arguendo, that the informant was shown to be credible or his information reliable, there was nothing legally sufficient to indicate that Kelly, in any event, may have been Crapper, the man with whom the information was concerned, other than his general appearance. On the contrary, the agents knew that Crapper was travelling under his correct name, and that the luggage he was supposed to be carrying, one brown bag and one green bag, was different from the luggage Kelly had, two green bags. Further, the agents could readily have ascertained that the baggage numbers of Kelly's luggage were not the numbers they had been given for Crapper's luggage. And we note that Kelly gave them his correct name when he was approached and had ample identification to establish his true identity, as the agents determined after the arrest. In the circumstances, the only possible justification for the arrest of Kelly would be that the agents had sound reason to believe that he was Crapper. It is clear that they had no such reason. There was simply insufficeint probable cause to arrest Kelly legally, and the State so conceded in oral argument before us.

The State suggests that the seizure of the contraband was valid because the search was by consent. It was Rinehart's testimony that after they placed Kelly under arrest, "Agent

Sabo asked him if he could check his luggage and he consented to us opening his luggage. Agent Sabo opened his luggage and the stuff was — well packed in the green tourister suitcase." This merely voiced Rinehart's conclusion that Kelly consented. On cross-examination Rinehart was asked to state verbatim what was said. He replied: "His statement that he — that Agent Sabo had made to him he asked him if he could look inside his baggage, and Mr. Kelly in turn said — I can't say verbatim, but he said something more less like 'yeah, you can look inside,' or 'go ahead,' or something in this reference." Rinehart did not remember whether or not Kelly asked, "Do I have to open my bags" or a question similar to that. Kelly testified that Sabo told him that he just looked suspicious and that they wanted to see what was in his bags. "I asked him if I had to open my bags and they told me I had to open them." We have no difficulty in determining that this evidence was not legally sufficient to show an effective consent to the search.

We hold that the trial court erred in denying the motion to suppress the evidence seized from Kelly. As the evidence was improperly admitted, and as it is patent that with this evidence excluded the State cannot prove that Kelly committed the offenses with which he is charged, the judgments are reversed without direction for a new trial.

*Judgments reversed; Anne Arundel County to pay costs.*