■ KENNETH R. HERNDON, as Infant, by MILDRED HERNDON, His Mother and Natural Guardian, Appellant, v. CITY OF ITHACA, Respondent.— Appeal from a judgment of the Supreme Court, entered November 3, 1971 in Tompkins County, upon a verdict rendered at a Trial Term, in favor of defendant. This is a negligence action for personal injuries sustained by Kenneth Ray Herndon when he was shot on May 26, 1966 by Charles Dolloway, a police officer employed by respondent. On May 26, 1966, Officer Dolloway was on duty in the vicinity of West Seneca Street, Ithaca, New York, at approximately 1:00 A.M. Earlier that night Herndon, who was 18 years of age and at the time was absent without leave from the United States Navy, had attempted to visit his estranged wife at her apartment in Ithaca. After twice unsuccessfully attempting to gain admittance to his wife's apartment, he walked to a laundromat known as "Wash-N-Shop" at 204 West Seneca Street which was open and empty except for a momentary visit of a young man who checked the dryers. Herndon entered the laundromat and purchased a coke from a machine and, while drinking the coke, leaned against a cigarette machine which was near the entrance. Dolloway testified that, while in uniform and making his routine patrol, he observed Herndon in the laundromat from across the street; that he observed Herndon pull open the front of the cigarette machine, insert his right hand into it at least twice, and return his hand to his trouser's pocket; that he then entered the building through the east doors and approached Herndon. At this point, Dolloway asked Herndon what he was doing, and he responded that he had had an argument with his wife and was waiting for her to cool off. Dolloway ordered him to empty his pockets which he began to do, removing some coins from his pocket and placing them on a counter. Then, according to Dolloway, Herndon lunged at him, striking and causing him to fall backwards, ran through the east doors and turned left where Herndon was confronted with a six-foot high picket fence. Before Herndon reached the doors, the officer twice called out "Halt! You're under arrest" and fired a warning shot. He followed Herndon through the east doors and again, gun in hand, shouted "Halt! You're under arrest." Although Herndon had available another avenue of escape, he turned around and ran towards Dolloway throwing an object, later identified as a plastic gear shift knob, at him and striking him. He then grabbed the officer's right arm and gun with both hands. While Dolloway was attempting to strike him on the side of the head with the weapon, it discharged into Herndon's neck, injuring the spinal cord to the extent that he is a paraplegic permanently confined to a wheelchair. While Herndon was at the hospital following his injury, police searched his trousers and $4.75 in quarters and nickels were found therein. Later Herndon was indicted for felonies arising out of the

occurrences at the laundromat, which indictment was dismissed by the court without submission to the jury. Prior to the trial in the criminal case, the search of Herndon's clothing at the hospital was held to be illegal, and the evidence obtained thereby was suppressed. The action was based on negligence and different versions of the happening of the accident were presented and resolved by the jury in respondent's favor. There were no requests or exceptions to the trial court's charge, and the jury's verdict was unanimous. Herndon's first contention is that the jury's verdict of no cause of action was contrary to the weight of the evidence. The trial court submitted the case to the jury on two separate theories. The first theory was the claim that the respondent was negligent since its employee, Officer Dolloway, had no right to make an arrest of Herndon. The second theory was that if Herndon was committing a crime in view of the officer, whether the officer acted in a reasonable and prudent manner under the circumstances in attempting to make the arrest and prevent escape. The trial court charged the ordinary rules of negligence and freedom from contributory negligence. On both theories asserted by Herndon, the issues of legality of the arrest, the manner in which the attempted arrest was made, the negligence and contributory negligence of the parties, are all issues within the sole province of the jury. (*Flamer* v. *City of Yonkers*, 309 N. Y. 114; *Thompson* v. *City of New York*, 25 A D 2d 842; *Toomey* v. *New York City Tr. Auth.*, 6 A D 2d 906.) Herndon's next contention is that the trial court erred in excluding proof that he was acquitted of all criminal charges arising out of the incident. It is well settled that a judgment of acquittal in a criminal prosecution is not admissible in a civil action arising out of the same circumstances. (*Matter of Fox* v. *United Brotherhood of Carpenters & Joiners of Amer., Local No. 606*, 33 A D 2d 605, mot. for lv. to app. den. 25 N Y 2d 744; *Massey* v. *Meurer*, 25 A D 2d 729.) Herndon also contends that it was error for the trial court to admit into evidence a statement made by him to a fellow inmate, one Wallace, in County Jail 20 days before the incident in question. Wallace was allowed to testify that Herndon told him that if the authorities or police ever came and got him again, they would not take him alive. Herndon argues that there was no proof that Dolloway was aware of his assertion until after the incident. It is clear, however, that such a statement would be admissible to show Herndon's state of mind, the remoteness in time affecting its weight, but not its admissibility. (21 N. Y. Jur., Evidence, § 332; *Provenzo* v. *Sam*, 23 N Y 2d 256; *Loetsch* v. *New York City Omnibus Corp.*, 291 N. Y. 308.) Herndon's final contention is that the evidence of $4.75 in change obtained as a result of an illegal search of his clothing at the hospital was erroneously admitted in the present action. In the prior criminal proceeding involving Herndon, the evidence of the money so obtained by the search had been suppressed. Illegally obtained evidence is excluded where the proceedings, although civil in form, are of a quasi-criminal nature, and the evidence obtained was by means of an illegal search and seizure conducted contrary to the Fourth Amendment. (*Plymouth Sedan* v. *Pennsylvania*, 380 U. S. 693; *People* v. *Florus*, 67 Misc 2d 809.) This action is not a quasi-criminal proceeding whose object is the punishment of Herndon or retention of his property. It is Herndon, not only by bringing the action but in his own testimony, who raises the issue as to whether he committed a crime. When a person affirmatively offers testimony that he did not commit a crime, he opens the door for use of rebutting evidence even though it was illegally obtained. In civil cases which are not quasi-criminal, or in which penalties or forfeitures are not sought, evidence illegally obtained is admissible when the party seeking

to exclude the evidence, has made an affirmative claim for relief against the governmental body. (*Dixson* v. *State of New York*, 30 A D 2d 626; cf. *Walder* v. *United States*, 347 U. S. 62.) In *Walder* (*supra*), the court stated at page 65 as follows: "It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths." The jury's verdict of no cause of action in favor of respondent should be affirmed. Judgment affirmed, without costs. Staley, Jr., J. P., Greenblott, Main and Reynolds, JJ., concur; Cooke, J., dissents and votes to reverse in the following memorandum. Cooke, J. (dissenting). While I agree with the court's disposition of Herndon's first three contentions, I cannot abide by its resolution of the final question, i.e., whether evidence that was ruled inadmissible in the criminal proceedings against plaintiff, due to illegal search and seizure, must also be excluded at the civil trial arising out of the same facts, particularly where plaintiff took the stand and denied having committed any crime. This is a question of first impression and its resolution turns on the evolving exclusionary doctrine of *Mapp* v. *Ohio* (367 U. S. 643). In that case, the United States Supreme Court ruled that evidence which was seized in violation of the Fourth Amendment by State officials was required to be excluded in a criminal trial in State courts. In so ruling, the court (p. 656) cited *Elkins* v. *United States* (364 U. S. 206, 217) as recognizing "that the purpose of the exclusionary rule 'is to deter — to compel respect for the constitutional guaranty in the only effectively available way — by removing the incentive to disregard it.'" The court further noted that the State, by admitting evidence unlawfully seized, serves to encourage disobedience to the Federal Constitution which it is bound to uphold. The *Mapp* decision has been extended to civil proceedings involving penalties or forfeitures, the rationale being that the deterrent effect of the exclusionary rule is just as essential to the integrity of the proceeding regardless of the label applied (*Plymouth Sedan* v. *Pennsylvania*, 380 U. S. 693; *Matter of Finn's Liq. Shop.* v. *State Liq. Auth.*, 24 N Y 2d 647, 653, cert. den. 396 U. S. 840; *Incorporated Vil. of Laurel Hollow* v. *Laverne Originals*, 17 N Y 2d 900; *Matter of Genovese* v. *Hostetter*, 33 A D 2d 531; *Chmielewski* v. *Rosetti*, 59 Misc 2d 335; *Reyes* v. *Rosetti*, 47 Misc 2d 517; see Anno, Admissibility, in a Civil Case, of Evidence Obtained by Unlawful Search and Seizure, 5 ALR 3d 670; see generally Comment, Fourth Amendment and Exclusionary Rule in Civil Cases, 43 Denver L. J. 511). In *Matter of Finn's Liq. Shop* v. *State Liq. Auth.* (*supra*, p. 653), the Court of Appeals, in excluding evidence illegally seized by agents of the State Liquor Authority in an administrative proceeding, stated that "To the extent that the State, or its agents, can bypass the deterrent effect of the exclusionary rule by using the fruits of an illegal search in a 'civil' or 'administrative' proceeding, the incentive for enforcement and investigative personnel to exceed constitutional limitations on their activity remains and the effectiveness of the rule as a deterrent is diminished." This solicitousness for Fourth Amendment rights, which, unlike Fifth and Sixth Amendment rights, are not limited to criminal proceedings (*Terpstra* v. *Niagara Fire Ins. Co.*, 26 N Y 2d 70), was recently reasserted by the Court of Appeals in *Terpstra* v. *Niagara Fire Ins. Co.* (*supra*, pp. 74–75) where the court said: "[Fourth Amendment] Rights are breached at the time the Government wrongfully invades the citizen's privacy * * *. The victim of such action has in no way voluntarily or freely made evidence available

to the Government. * * * Thus, under the Fourth Amendment, the citizen has a right to be secure in his belongings and this security ought *reasonably* to extend to *whatever* use is to be made of this illegally obtained evidence *even if it falls into the hands of private parties for private purposes* " (emphasis supplied). Thus, following *Terpstra,* the state of the exclusionary rule in New York would appear to be as follows: evidence illegally seized by private parties may be used in both civil (*Sackler* v. *Sackler,* 15 N Y 2d 40) and criminal proceedings (*People* v. *Horman,* 22 N Y 2d 378, cert. den. 393 U. S. 1057); evidence illegally seized by governmental agents may not be used in civil proceedings that are penal in nature (*Matter of Finn's Liq. Shop* v. *State Liq. Auth., supra*), nor may such evidence generally be used by private parties in purely civil cases '(*Terpstra* v. *Niagara Fire Ins. Co., supra*). May a government, then, in a purely civil proceeding use evidence that has been illegally seized by its agents? The answer, under the line of decisions cited above, is plainly that it cannot (see Barker, Admissibility in Civil Actions of Constitutionally Protected Evidence: Some Brief Observations, 34 Albany L. Rev. 512, 514-515). It remains to be considered, however, whether such evidence may be used to impeach a party or witness. In *Walder* v. *United States* (347 U. S. 62, 65), the Supreme Court, in addressing itself to this very question, commented: " It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine would be a perversion of the Fourth Amendment. * * * [T]here is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." (See, also, *People* v. *Johnson,* 27 N Y 2d 119, 122-23, cert. den. 401 U. S. 966; *Terpstra* v. *Niagara Fire Ins. Co.,* 26 N Y 2d 70, 74; *Dixson* v. *State of New York,* 30 A D 2d 626.) Our Court of Appeals, in a different context, has commented that such a rule would make little sense (*Terpstra* v. *Niagara Fire Ins. Co., supra,* p. 74). I would therefore hold that, although in a civil trial evidence which has been illegally obtained by governmental agents must be excluded in the case in chief, nevertheless, such evidence is admissible to impeach the credibility of a party or witness upon appropriate limiting instructions (cf. *People* v. *Johnson,* 27 N Y 2d 119, *supra*). Since the trial court did not limit the use of the illegally seized evidence to impeachment purposes, despite the lack of exception to the charge and in view of the substantial danger of prejudice to the appellant, I would reverse the judgment and order a new trial in the interests of justice (*Winser* v. *Trombley,* 14 A D 2d 963; *Peerless Cas. Co.* v. *Bordi,* 6 A D 2d 21).