516 P.2d 354

The STATE of Utah, Plaintiff and
Respondent,

v.

Loren Craig SIMS, Defendant and
Appellant.

No. 12828.

Supreme Court of Utah.

Nov. 28, 1973.

James N. Barber, Meredith, Barber &
Day, Salt Lake City, for defendant and ap-
pellant.

Vernon B. Romney, Atty. Gen., David L.
Wilkinson, and William T. Evans, Asst.
Attys. Gen., Salt Lake City, for plaintiff
and respondent.

CROCKETT, Justice:

Defendant Loren Craig Sims was con-
victed of murder in the first degree under
the "felony murder" rule [1] for the death of

I. Sec. 76–30–3, U.C.A.1953, Degrees of Mur-
der, provides that murder committed in the
perpetration of, or attempt to perpetrate, any
arson, rape, burglary or robbery . . . is
murder in the first degree.

Linda Huntsman which resulted in connection with perpetrating the crime of rape on her on the night of March 22, 1971, at an apartment on Highland Drive in Salt Lake City. In accordance with the jury's recommendation,[2] defendant was sentenced to prison for life. He attacks his conviction on the ground that it resulted from the use of illegally obtained evidence: by an unlawful search [3] of his bedroom; and statements obtained in violation of his right against self-incrimination.[4]

Mrs. Charlene Patterson, a nurse who worked at the Latter-Day Saints Hospital, lived with her seven-year-old son, Gerald, at an apartment on Highland Drive. She worked the night shift, 11:00 p. m. to 7:00 a. m., and hired Linda Huntsman, a 20-year-old student nurse, to stay overnight with Gerald. On March 22, 1971, at about 10:00 p. m., defendant Sims, who had had some dates with Mrs. Patterson, came to the apartment. After they visited for some time, Mrs. Patterson asked him to drive her to work, which he did. He had left his wallet in the den of the Patterson apartment. He returned there and knocked at the door, waking the boy Gerald. Gerald answered the door. Sims asked him if his mother was home. When Gerald answered that she was not, Sims told him to get his wallet from the sewing machine in the den, and after giving it to Mr. Sims, he saw no more of him.

After being at work for some time, Mrs. Patterson missed her glasses and, at 7:00 a. m., phoned to ask Miss Huntsman to bring them when she came to pick her up from work. The phone rang several times and was finally answered by Gerald. Mrs. Patterson asked him to see if Linda was awake. After trying to awaken her, he told his mother that Linda would not wake up and that there was blood on her chin. Mrs. Patterson then asked her supervisor, Karla Hogan, to take her home. When they got there, Mrs. Patterson seems to have suspected something was wrong, and did not want to enter the bedroom. Mrs. Hogan entered the bedroom, found it in disarray, and Linda lying in bed. She checked for vital signs [5] and, finding none, called the police. The police searched the apartment and found two pieces of black electrical cord on the bedroom floor, which from appearances they suspected may have been used to strangle the victim.

At approximately 9:00 a. m. that morning, detectives from the Salt Lake County

---

2. Sec. 76–30–4, U.C.A.1953, Penalty For Murder, provides that one guilty of murder, upon recommendation of the jury may be imprisoned in the state prison for life.

3. Sec. 14, Art. I, Utah Constitution, and Amendment IV of U.S. Constitution provide against unreasonable searches in practically identical language.

4. Sec. 12, Art. I, Utah Constitution, and Amendment V of U.S. Constitution.

5. Breathing, body warmth, pulse, heartbeat, and eye reaction.

sheriff's office went to Sims' home. They were aware of the facts alluded to above, and had other information, including the fact that there was another rape charge pending against defendant Sims, which led them to investigate the possibility of his being involved in the crime of concern here. His mother answered the door and admitted them into the living room. Asked about her son, she said he was asleep, but she would wake him. Shortly he appeared dressed only in a pair of Levi's. After introductory remarks, the officers told him that they were there to inquire about an incident involving some of his friends. Detective Benjamin Forbes read to him the "Miranda Warning" [6] from a card; and asked Sims if he understood his rights. He answered, "Yes"; and when asked if he would mind talking to them he said, "No. Go right ahead."

Upon being asked about his acquaintanceship with Mrs. Patterson and whether he had been at her apartment the night before, he answered affirmatively. When they inquired about the time, he asked why they wanted to know. They told him that Linda Huntsman had been murdered. Sims then asked if he could call his lawyer and was told that he could. He went to the telephone, and reported back that he was unable to contact his lawyer, because he was in court. The officers asked him if he would go down to his electrical shop with them. It is apparent that they had in mind checking about the black electrical cord which they suspected might be the lethal weapon. Sims agreed to go with them, but told them he would have to dress first. The officers then asked him if they could go with him to his bedroom, and there is no dispute but that he gave an affirmative response. While in the bedroom, during the time Sims was dressing, Detective John Bernardo saw a black turtleneck shirt lying on one of the chairs. Upon it he observed some long strands of light brown hair, which to his mind seemed to match the hair of Linda Huntsman.

When Sims finished dressing in boots, Levi's and a plaid shirt, Detective Bernardo asked him if those were the clothes he had worn the night before. Sims said they were. (It appears that this was either a falsehood, or a serious mistake on a vital matter, because other testimony at the trial was that Sims had worn a black turtleneck shirt the night before.) Sims then drove his truck, and the detectives followed in their car, to the shop where the desired inspection was made, but without any significant result.

There is no doubt that the introduction of evidence concerning the matters just set forth above were significant and material parts of the State's case. Upon this, together with other evidence concerning sim-

6. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ilarity of types of blood and semen, identification of fabric fibers on Sims clothing as matching fibers from the blanket on the bed, and testimony of a witness that Sims told him about leaving the wallet in the apartment as a pretext, and going back to rape the victim, the jury found the defendant guilty.

In considering the defendant's claim that his constitutional right was violated by an unlawful search, attention should be focused on the fact that the constitutional language does not prohibit all searches, but only those which are "unreasonable"; and that this is to be determined from all of the attendant circumstances. Detective Bernardo explained in his testimony that, although the investigation of the crime was yet in its preliminary stages, they realized that there was a possibility that the defendant had committed the crime, and that after he knew they were peace officers, there were several things to be guarded against if he got out of their sight, including that he might try to escape, or might obtain a gun, and no one could tell what might happen.[7] It was for these reasons that they asked the defendant if they could accompany him to the bedroom, to which he assented.' It is also to be noted that there was no actual search conducted, but what the detectives found was in plain sight.[8]

We see nothing in these circumstances resembling the type of highhanded or ruthless intrusion into the privacy of defendant's person, home, or belongings which the constitutional provisions were designed to protect against. Accordingly, there is no basis whatsoever to justify a conclusion that there was any unreasonable search or seizure,[9] either in the actions just described, or in taking the defendant's clothing after he was placed under arrest and subjecting them to scientific scrutiny.[10]

The charge of violation of the defendant's right not to be required to give evidence against himself should also be looked at in the same light of reason. Consideration should be given to the rights of the suspect (and all other individuals); but there also should be had in mind the practical exigencies of allowing peace officers reasonable freedom in the investigation of crime so that the interests of the general public may be protected from crime and criminals. From the fact that the defendant wanted to call his attorney

7. As to reasonableness of search for weapons cf. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685.

8. As to seizure of what appears to be material evidence which is in plain view see State v. Martinez, 28 Utah 2d 80, 498 P.2d 651; and case of same name, 23 Utah 2d 62, 457 P.2d 613, and authorities therein cited.

9. See Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730; State v. Hatcher, 27 Utah 2d 318, 495 P.2d 1259 (1972).

10. See Sec. 77-54-20, U.C.A.1953.

and did so, but nevertheless told the officers to "go ahead" with their questions, it appears that in awareness of his privilege he waived it by voluntarily answering questions.[11] On the same principles as stated above with respect to the charge of unreasonable search, we see no reason to disagree with the view of the trial court that there had been no such violation of the defendant's constitutional right against self-incrimination as to render the evidence in question so tainted as to be inadmissible.[12]

The defendant has asserted other claims of error which we do not regard as being of sufficient merit to justify discussion, except to say that we have found no error which either singly or collectively causes us to doubt that the defendant was accorded what the law entitles him: an opportunity to have all of the evidence on both sides of his case presented to an impartial jury in a fair and proper manner, who unanimously believed beyond a reasonable doubt that he was guilty of the crime charged.

Affirmed. No costs awarded.

CALLISTER, C. J., and HENRIOD, ELLETT and TUCKETT, JJ., concur.

11. See statement in Miranda v. Arizona, footnote 6 above.

12. That such questions are for trial court in first instance, not to be disturbed unless plainly in error, see State v. Allred, 16 Utah 2d 41, 395 P.2d 535, and authorities therein cited, including Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081.