OPINION
Ralph Van Hoose, Jr. appeals from his conviction in the Montgomery County Court of failing to obey a lawful order of a police officer and driving an overloaded vehicle.
On December 16, 1999 at 2:05 p.m. Trooper James Bennett of the Ohio State Patrol ("OSP") observed appellant's truck eastbound on Interstate 70 as Trooper Bennett was westbound on Interstate 70. Bennett testified at a pre-trial suppression hearing that the first reason he stopped Van Hoose's truck was "those trucks drive between Huber Heights and Fairborn every day and they're notorious for having out-of-service violations on them or being in an out-of-service condition." The second reason Bennett said he "turned on him because I was going to stop him and just do an inspection on it." (Mot. at 9). Bennett testified that R.C. 5503.34
permits him to stop any commercial carrier solely to do an inspection on it. (Mot. at 8).
Bennett testified at the suppression hearing as follows:
 Q. And did you stop the defendant's vehicle to do an inspection on December 16th, 1999?
 A. Yes, sir, I did. And before I had hit the lights on him, I also observed several federal violations. He didn't have any lights shining to the rear. They were completely covered with mud, the whole back end of the trailer was. And so I knew that was an out-of-service violation, the vehicle was in an out-of-service condition right there.
Bennett also testified that Van Hoose's truck tires were bulging excessively and the truck was pulling hard up a slight grade. Bennett then testified that he stopped the appellant's vehicle and informed appellant of the purposes of the stop. Bennett testified as follows:
 A. I approached the defendant on the right side, the passenger side. I knocked on the passenger door, the defendant opened it. Told him the reason why I stopped him, we would be doing a Level 2 DOT inspection on his truck. I asked for proper identification and registration for the vehicle and any shipping bills or weigh slip that he might have, which he didn't have. And then I told the defendant — I actually asked him to follow me down to 235 and we'd be getting off on Technology. I think he was familiar with the location.
 Q. Is that weigh station within three miles of the place where you stopped the defendant's vehicle?
A. Yes, sir.
 Q. Okay. And you were taking him down there to have his truck weighed. Is that correct?
 A. I was taking the truck down there to inspect it and then ultimately, yes, have it weighed.
 Q. Okay. And you were ultimately having it weighed because of the tire bulge. Were there other factors there?
 A. It was pulling hard. And now I noticed he didn't have any weigh bills, so we couldn't tell what it actually weighed. He had no weigh ticket.
 Q. Does the authority to inspect a vehicle as you have described for us today under the section which you have told us about also give you the authority to weigh a vehicle?
A. Yes, sir, it does.
 Q. Okay. Now, so, you got back to the weigh station. What happened there?
 A. I took him over to Technology Boulevard off of Artz Road and had the defendant park in a road there. At that time, I had the scale, portable scale van show up, at which time he did. It was Load Limit Frank that showed up. And he got the scales out, placed them on the ground. I had started my inspection. I punched all the necessary information into the computer. And then I asked the — stepped out of my cruiser and asked the defendant to pull up on the scales, we'd need him to pull up on the scales, at which time he said, well, I need to call my boss first. And I told him, well, it really doesn't matter what your boss says, you need to pull up on the scales, I'm giving you an order to pull up on the scales.
Q. What was his response to that?
 A. He told me that he's not pulling up on the scales. I asked him three times total, and told him the last time that, if you don't pull up on the scales, I'm going to place you under arrest for failure to comply.
Q. What was his response to that?
 A. He said that he's not going to pull up on the scales without calling his boss.
Q. Okay.
 A. So, I placed him under arrest and called a wrecker out there.
Q. And the wrecker arrived. Right?
A. Yes, sir.
Q. Did you know this wrecker?
 A. No. I just called the post for next available wrecker, large wrecker.
Q. And who was the wrecker? Do you recall?
A. I can't really remember.
 Q. Did the wrecker driver actually pull the defendant's vehicle onto the scales?
A. Yes, he did.
Bennett testified at the suppression hearing that the tow truck driver had a Class A Commercial Driver's License and was therefore authorized to drive the appellant's truck onto the truck scales.
On cross-examination, Bennett admitted he made the decision to stop the appellant's truck upon seeing it coming in the opposite direction on the interstate highway. He admitted he did not see the tire bulge or the tail lights at that time. The following testimony was elicited during the cross-examination:
 Q. At the point you made the decision to stop this vehicle, you didn't even wait to get to a turnaround, did you?
A. No, sir, I didn't.
 Q. You just did a quick 180 through the median strip and immediately pursued this vehicle with your lights on intending to stop it?
A. Absolutely.
 Q. It was only after you had made the decision to stop this vehicle with your lights on that you observed that there might be something amiss about it?
A. That's correct.
 Q. Now, your testimony is that you saw that the tail lights, after you had decided to stop the vehicle, were covered with mud?
A. That's correct.
Q. It was broad daylight, wasn't it?
A. Yes, it is.
 Q. You don't even have to have illuminated tail lights in broad daylight, do you?
A. You need brake lights and turn signals.
Q. Was he turning?
 A. Brake lights and turn signals are required by law.
(Emphasis ours).
On further cross-examination, Bennett stated the scale crew took about ten minutes to arrive and that he asked the defendant to move his truck onto the scales, but the defendant indicated he wished to call his boss first. When the defendant continued to refuse to comply, Bennett said he arrested him for failure to comply with his order. (Trial, 18:54 videotape). The truck was weighed and determined to be overweight.
The trial court overruled the defendant's motion to suppress the evidence gained as a result of the stop of his truck by Trooper Bennett. The trial court found Van Hoose guilty of both charges after a bench trial.
In his first assignment, Van Hoose contends the trial court erred in overruling his suppression motion because Trooper Bennett did not possess articulable suspicion to believe he was violating any law prior to his stopping his truck. He also contends in his second assignment that he did not refuse to comply with a "lawful" order.
In State v. Meyers (1990), 63 Ohio App.3d 765, we held that courts have limited the power of police officers to stop vehicles and inspect them under the authority of R.C. 4513.02(B). We held that in order for a police officer to stop a vehicle for a safety inspection, a police officer must have some articulable and reasonable suspicion that the vehicle or its equipment is either unsafe, not in proper adjustment, or in violation of law.
Whether articulable suspicion exists for the officer's conduct is a question of law and we review the trial court's action "de novo" or independently. Ornelas v. United States (1996), 517 U.S. 690,116 S.Ct. 1657, 134 L.Ed.2d 911.
In this case, Trooper Bennett testified he used two justifications for stopping Van Hoose's truck. First, he contended he had authority to do so pursuant to R.C. 5503.34. That statute provides as follows:
 Uniformed employees of the commercial motor vehicle safety enforcement unit may stop commercial motor vehicles for the exclusive purpose of inspecting such vehicles to enforce compliance with orders and rules of the public utilities commission as required by division (F) of section 5502.01 of the Revised Code.
In State v. Landrum (March 9, 2000), Vinton App. No. 99-CA-531, unreported, the Vinton County Court of Appeals held that a stop based on R.C. 5503.34 is not constitutional absent compliance with Ohio Admin. Code 4901:2-5-13(C). In a well reasoned opinion which we find persuasive, Judge Harsha wrote the following on behalf of the appellate court at page 6 of the opinion:
 Third, the statute must provide a constitutionally adequate substitute for a warrant which limits the enforcement officers' discretion in the "time, place and scope" of the inspection. R.C. 5502.01 indicates that the Department of Public Safety must enforce compliance with specific sections of the Revised Code regarding commercial motor vehicle transportation safety, economic and hazardous materials requirements. Absent application of Ohio Adm. Code 4901:2-5-13(C), no limitations are placed on the discretion of the safety inspectors. The statute itself conveys virtually complete discretion on the motor vehicle safety enforcement unit in deciding which trucks it will stop and when they may be stopped. Therefore, we conclude that the third prong of the Burger test was not met if Ohio Adm. Code 4901:2-5-13(C) or a similar provision is not followed by the enforcement unit.
The State presented no evidence Officer Bennett complied with Ohio Admin. Code 4901:2-5-13(C) prior to stopping Van Hoose's truck.
Bennett stated the other reason he stopped Van Hoose's truck was because "those trucks drive between Huber Heights and Fairborn every day and they're notorious for having out-of-service violations on them or being in an out-of-service condition." Bennett was not more specific in his testimony. He did not testify he had ever stopped one of these trucks. We are not convinced that reputation evidence alone provided the requisite "articulable suspicion" for stopping the defendant's vehicle.
Although Trooper Bennett testified that "before I had hit the lights on him" he had observed several federal violations, he retracted this testimony on cross-examination by stating that he had not observed anything unlawful until he had pursued the defendant with his overhead lights on. Bennett was not rehabilitated in his testimony on a redirect examination.
We have held that a stop occurs when the defendant stops his vehicle in response to a pursuing officer's vehicle's overhead lights. Bennett testified that Van Hoose stopped promptly in response to Bennett's activating his cruiser's overhead lights. (Mot. 15).
Having determined that the stop of the defendant's truck was unconstitutional, any evidence found as a result of the stop must be suppressed pursuant to the exclusionary rule. Mapp v. Ohio (1961),367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. Accordingly, Van Hoose's conviction for driving an overloaded vehicle must be vacated. Similarly, because the stop of the appellant's truck was improper, the order for him to drive his truck onto the scales was an unlawful order. Since Van Hoose was charged with a violation of R.C. 2921.331(A), which requires the order of the police officer to be lawful, that conviction must also be set aside. The appellant's first and second assignments of error are sustained. The appellant's other assignments are rendered moot due to our resolution of the first two assignments. See, App.R. 12.
The judgment of the trial court is Reversed and the defendant's convictions are hereby ordered Vacated.
 _________________ BROGAN, J.
WOLFF, J., and YOUNG, J., concur.