Filed 3/2/21  P. v. Schumann CA4/2
See Concurring Opinion

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074167 |
| v. | (Super.Ct.No. FSB032415) |
| KATHERINE SCHUMANN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steve Malone, Judge.  Reversed.

David P. Lampkin, under appointment by the Court of Appeal, for Defendant and Appellant.

Jason Anderson, District Attorney and James R. Secord, Deputy District Attorney for Plaintiff and Respondent.

1

In 2004, defendant Katherine Schumann, along with codefendant Gregory Vance, Jr., was convicted of murder (Pen. Code,[1] §187, subd. (a)) under the felony-murder doctrine, after both entered the residence of the victim, via separate access points, for the purpose of stealing money. In 2019, following the passage of Senate Bill No. 1437 (2017-2018 Reg. Sess.) and the enactment of section 1170.95, defendant petitioned for resentencing. The trial court denied the petition on the ground that section 1170.95 was enacted pursuant to legislation that attempted to amend or modify statutory provisions enacted pursuant to citizen initiatives, specifically Proposition 7, passed by voters in 1978, and Proposition 115, passed by voters in 1990, in violation of article II, section 10, subdivision (c) of the California Constitution. Defendant appealed.

On appeal, defendant argues that Senate Bill No. 1437 was not an unconstitutional amendment of Propositions 7 or 115. We reverse.

## BACKGROUND

We summarize the facts from our prior opinion in *People v. Schumann* (Aug. 4, 2006, E036689 [nonpub. opn.]) from the direct appeal, affirming the defendant's conviction, editing for brevity.

Gregory Vance and his girlfriend, defendant Katherine Schumann, were involved in a counterfeit check-cashing scheme with the murder and burglary victim, Ellis, and three others, Daniels, James, and Fanning. The scheme involved depositing fraudulent checks into Ellis's bank account and withdrawing the cash. Ellis was 59 years old, nearly

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

blind, and used a walking stick. James was Ellis's caretaker, and introduced Vance and Schumann to Ellis. At one point, Vance and Schumann discovered that $100 was missing from the bank account.

On October 23, 2001, at approximately 1:00 a.m., Vance and Schumann confronted James, Daniels, and Fanning, while the three of them were sitting in Daniels's car outside Fanning's house. Fanning lived across the street from James. Vance broke the driver's side window of the car. Vance and Schumann both displayed knives and demanded to know where their missing money had gone. Daniels, James, and Fanning each denied knowing about the missing money.

Vance and Schumann then suggested that the group go to Ellis's house to discuss the matter. Ellis lived only one street over from Fanning and James. Vance and Schumann threatened to "fuck [Daniels's] ass up" if he did not drive them there. They also said that Ellis "better have [the] money" or they were going to "fuck some people up," including Ellis. Schumann specifically said that Ellis better have "her" money or she was going to "fuck him up."

Daniels told defendants he did not want to be involved, but he drove defendants to Ellis's house. James did not go with them; he went home. After they arrived at Ellis's house, Fanning stayed in the car with Daniels while Schumann went up to the front door and Vance went to the side of the house. Fanning saw Schumann go inside the house, and heard Vance say from inside the house, "[D]o not mess with me. I told you not to mess with me."

3

Ellis called 911 and Vance's voice was heard on the recording of the call, made at 3:42 a.m. on October 23, 2001. Ellis reported that someone was trying to break into his house and provided his address. The 911 dispatcher asked Ellis for his name, but there was no further reply from Ellis. Before the call ended, Vance was heard saying, "Where's the money at? Where's my motherfucking money?"

Not more than 20 minutes later, James, who had heard noises coming from Ellis's house, came out of his house and went to check on Ellis. As James approached Ellis's house, he saw Vance and Schumann come out of the house and get into Daniels's car. Daniels then drove away. James found Ellis's front door wide open. The house was in disarray. Objects had been thrown around and pieces of furniture were turned over. Ellis was slumped over, and his back was soaked with blood. Ellis asked James to call the police and an ambulance and said, "That bitch got me." James did not ask Ellis whom he meant by "that bitch." James could not find a telephone in Ellis's house. He went outside to look for help and flagged down a sheriff's car.

Meanwhile, Schumann and Vance had jumped back into Daniels' car. Vance had a knife in his hand and blood on his jacket, and repeatedly said, "I didn't have to do the old man like that." He also said, "I got fucking blood on my hands." After they drove away from Ellis's house, Schumann threw her and Vance's knives by a gutter or sewer drain on Baseline Street, and got out of the car near Fairfax Street.

Ellis had a laceration on the right eyelid area and two stab wounds in his left lower back. The stab wounds punctured his left lung and chest and caused his death. He was

4

pronounced dead at 4:13 a.m. Police determined that the point of entry into Ellis's house was the side window. The screen was on the ground and the window was open. Daniels directed a detective to a drainage ditch near Baseline Street, where a knife and a broken knife handle were recovered. DNA analysis revealed that Ellis's blood was on the knife. Ellis's blood was also found on the black jacket that Vance was wearing that night.

Vance was arrested on October 25, 2001. In a videotaped, October 25 police interview, Vance denied killing Ellis. He admitted punching Ellis, but said that Schumann killed Ellis. In a subsequent videotaped police interview on October 26, Vance admitted he stabbed Ellis twice in the back. At trial, Schumann's jury was instructed to consider the October 25 videotaped interview for the sole purpose of showing Vance's "demeanor during the interview, and the conduct of the detectives in questioning Vance."[2]

Schumann testified that she was not interested in any of the missing money, but went with Vance to Fanning's and Ellis's houses because Vance wanted her to accompany him. She said she always carried a knife for protection, and said she brandished it in front of James only because he frightened her. She denied threatening anyone, and denied she was using drugs that night. She also denied intending to harm Ellis or taking anything from his house, or that there was any discussion about harming Ellis or taking anything from him.

---

[2] Daniels was also charged with murder and burglary, along with Vance and Schumann. He pled guilty to accessory to murder and two counts of forgery, in exchange for a maximum sentence of four years four months and his agreement to testify truthfully.

After Vance was inside Ellis's house, Schumann testified she knocked on the door because she was concerned the police would be called and she wanted to get Vance out of there. As she approached the house, she heard Ellis saying, "[T]hat's enough, that's enough," and heard Vance say, "[W]here's my mother fucking money." Vance opened the door, and Schumann stepped one foot inside. Ellis was on his knees in a praying position, looking at her and not speaking. She asked Vance, "[W]hat the fuck are you doing?" She thought that Vance had hit Ellis or gotten into a "tussle" with him. She saw Ellis's phone on his couch, and pushed a button to turn it off, but it rang back. She told Vance they needed to get out of there, and they left.

Schumann said she was only in Ellis's house for about 10 seconds, and never pulled her knife out in the house. She also did not see Vance pull out a knife, and was never aware he had one. As they were driving away, she threw her knife out the car window, together with another knife that Fanning handed to her. She said she wanted to get rid of her knife and any other "paraphernalia" in the car because she thought Ellis had called the police. She also said Vance told her to throw both knives out the window. She did not see any blood on Vance, and did not know Ellis had been stabbed until police questioned her later on October 23.

## DISCUSSION

Defendant appeals the denial of her section 1170.95 petition and argues that Senate Bill No. 1437, pursuant to which section 1170.95 was enacted, is not unconstitutional. The People contend Senate Bill No. 1437 unconstitutionally amended

sections 188 and 189, directly conflicts with the rights of victims established in Proposition 7, and improperly invades the separation of the power between the legislature and the judiciary, urging us to uphold the trial court's denial of defendant's postconviction petition. The People also argue that Senate Bill No. 1437 conflicts with Marsy's Law.[3] (Prop. 9, 2008.)

Our Supreme Court has granted review in various cases with related issues concerning Senate Bill No. 1437, but has not yet addressed the particular issue with which we are currently engaged.[4] But it has given rather clear indications as to its thinking on the issue by denying review and declining to depublish decisions upholding the statute as constitutional. (See *People v. Lamoureux* (2019) 42 Cal.App.5th 241 [review denied, request for depub. denied]; see also *People v. Bucio* (2020) 48 Cal.App.5th 300 [review denied, July 8, 2020].)

At the same time, the Supreme Court has granted review and retransferred extraordinary writ denials to reviewing courts with directions to vacate their denials and issue orders to show cause to the respondent courts why relief should not be granted. (See *Davidson v. Superior Court,* review granted with directions, Oct. 9, 2019, S257384;

---

[3] We grant the People's unopposed request for judicial notice of the Legislative Counsel Bureau Letter dated March 12, 2018, concerning Assembly Bill 3104 (2017), respecting accomplice liability for felony murder.

[4] Review was granted in *People v. Smith* (2020) 49 Cal.App.5th 85 (review granted July 22, 2020, S262835), but the issues presented there pertain to whether a trial court may consider the record of conviction in determining whether the petitioner has made a prima facie case of eligibility for relief under section 1170.95, and at which point the right to appointed counsel arises under section 1170.95, subdivision (c).

*Lopez v. Superior Court,* review granted with directions, Oct. 9, 2019, S257429; *Nelson v. Superior Court,* review granted with directions, Jan. 2, 2020, S259115.)

The other appellate courts that have considered these issues have unanimously rejected arguments similar to respondent's, beginning with *People v. Lamoureux, supra,* 42 Cal.App.5th 241 (review denied, req. for depub. denied); *People v. Superior Court* (*Gooden*) (2019) 42 Cal.App.5th 270, 286 [Fourth Dist., Div. 1]; *People v. Solis* (2020) 46 Cal.App.5th 762, 784; *People v. Cruz* (2020) 46 Cal.App.5th 740, 747; accord, *People v. Lopez* (2020) 51 Cal.App.5th 589, 594; *People v. Johns* (2020) 50 Cal.App.5th 46, 54–55; *People v. Alaybue* (2020) 51 Cal.App.5th 207, 211; *People v. Nash* (2020) 52 Cal.App.5th 1041, 1053; see also, *People v. Prado* (2020) 49 Cal.App.5th 480, 492; *People v. Smith* (2020) 49 Cal.App.5th 85, 91–92, review granted July 22, 2020, S262835; *People v. Bucio, supra,* 48 Cal.App.5th 300, 306.) The sole exceptions have been dissents in *People v. Lamoureux, supra,* 42 Cal.App.5th at page 268 [dis. opn. by O'Rourke, J.], and *People v. Lippert* (2020) 53 Cal.App.5th 304, 314 [dis .opn. by Ramirez, P. J.]. The Supreme Court appears to have endorsed the trend of decisions.

With this backdrop, it would be unreasonable to think there was a possibility that the Supreme Court would conclude other than that the legislation is constitutional, and it would not be productive to fight the current. Accordingly, taking guidance from those decisions that conclude that Senate Bill No. 1437 is constitutional as not conflicting with Propositions 7, 115, or 9, we follow suit and reverse the trial court's order denying the section 1170.95 petition. "Wisdom too often never comes, and so one ought not to reject

it merely because it comes late." (*Wolf v. Colorado* (1949) 338 U.S. 25, 47 [69 S.Ct.

1359, 1368, 93 L.Ed. 1782, 1795], overruled on a different point in *Mapp v. Ohio* (1961)

367 U.S. 643, 650-655 [81 S.Ct. 1684, 6 L.Ed.2d 1081].)

**DISPOSITION**

The judgment is reversed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>RAMIREZ</u>
P. J.


I concur:

<u>CODRINGTON</u>
J.

[*People v. Schumann*, E074167]

Slough, J., Concurring.

I am in agreement with the majority, Penal Code section 1437 is constitutional. I write separately only to express that my agreement is grounded, not on a prognostication of how the California Supreme Court will likely decide the issue, but rather on the substantive legal analysis as fully set forth in this division's published opinions, *People v. Johns* (2020) 50 Cal.App.5th 46 (opn. of Slough, J.) and *People v. Lippert* (2020) 53 Cal.App.5th 304 (opn. of Codrington, J.).

SLOUGH         

                         J.

1