*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DAVID HENRY SERGES,

        Defendant-Appellant.

FOR PUBLICATION
April 4, 2024

No. 355554
Genesee Circuit Court
LC No. 18-042951-FC

Before: HOOD, P.J., and SWARTZLE and REDFORD, JJ.

SWARTZLE, J. (*concurring dubitante*).

There is little about this case that is not unsettling. The brutality of the murder is unsettling. The police officer's purported suspicion of defendant based on the mere brushing of one's legs, and that officer's subsequent change in testimony about why defendant was arrested, are unsettling. The lack of reliable evidence of guilt, aside from the DNA evidence, is unsettling. And finally, our state's jurisprudence with regard to the warrantless search of a person's property absent probable cause or plain sight is, while maybe not unsettling, at least unsettled. Because the question of whether the search was lawful is a close question, I cannot find either plain error or fault with defense counsel's performance regarding the DNA evidence. I concur *dubitante*, however, to suggest that our Supreme Court take a close look at this case in light of our unsettled jurisprudence.

To begin, as to why defendant was initially arrested, the majority states: "Detective Freeman testified unequivocally [during the *Ginther* hearing on remand] that defendant was arrested for the murder. Defendant's detention and jailing arose in relation to the murder investigation and not any investigation of his pending misdemeanors. The two aspects of defendant's placement in jail appear to have intersected coincidentally. In any event, the record supports that defendant's pants were taken incidental to his lawful arrest which gave the police the authority to search them."

With respect, there was nothing coincidental about the two aspects. From the outset, the police suspected defendant of the victim's murder, but there was little-to-no reliable evidence tying him to the scene. There were no fingerprints, shoe prints, weapons, visible blood, or the like to

-1-

connect defendant with the murder. There were eye-witnesses putting defendant on the general scene within a day or so of the crime, but this was not particularly damning given that defendant had done numerous odd jobs for the victim. This "vicinity" evidence was all that police had when defendant was arrested, and such evidence could hardly be said to amount to probable cause.

Consistent with this lack of probable cause of murder at the time of arrest, the evidence introduced at trial and defendant's motion for new trial confirms that police initially arrested him on a misdemeanor charge for failing to appear at court. The register of actions in the unrelated misdemeanor case, for example, shows that defendant was arrested on a warrant in that case on November 30, 2017, three days after the murder. Then, while in jail on that misdemeanor, defendant was arrested for another unrelated charge of theft on January 18, 2018. A day later, defendant's pants were submitted to a state laboratory for testing, during which the victim's DNA was subsequently identified in a speck of blood that was unobservable with the naked eye. The DNA report was completed on March 8, 2018, and the felony warrant and complaint charging defendant with the victim's murder were issued on March 12, 2018.

To be sure, during the trial court's *Ginther* hearing on remand, Officer Freeman testified that he arrested defendant on suspicion of murder on November 29, 2017. But, the officer also testified that he immediately sought a warrant for defendant for the murder, but the warrant was denied. The officer went on to explain that defendant remained in jail on the unrelated charges. When confronted with a police report that indicated defendant was initially arrested on an unrelated charge, Officer Freeman testified that the report was inaccurate.

Except for Officer Freeman's testimony during the *Ginther* hearing, no other evidence in the record—either during defendant's trial, the motion for new trial, or on remand—suggests that defendant was initially arrested for murder. With that said, if the trial court had concluded that, based on its own review of the evidence, as a matter of fact defendant had been initially arrested for murder, then this Court would have had to accept that factual finding in the absence of clear error. But critically, the trial court made no such finding—just the opposite. Specifically, the trial court explained in its ruling after the *Ginther* hearing, "[T]he pants are ones that he was wearing *when he was taken into custody on an unrelated matter*. He had an outstanding warrant on another case. And, when he was taken into custody, those pants he was wearing, and they were held by the jail." (Emphasis added.)

Thus, I take it as an established fact that defendant was *not* initially arrested and held on suspicion of murder, but rather he was arrested and subsequently held on unrelated misdemeanor charges. I have no doubt that police suspected defendant of murder, but until the DNA report came back in March, there was no probable cause to support such suspicion.

With respect to the lack of probable cause to search the pants, one could legitimately ask, "But so what?" Police unquestionably had lawful possession of defendant's possessions, including his pants, while he was in jail on the unrelated charges. And, as part of their investigation, police could certainly consider any evidence in plain view or inventoried in the normal course that might incriminate him in the murder, such as blood on his pants. Fair points both.

And yet, neither point is dispositive on whether police had lawful authority to send the pants to be analyzed for DNA in January 2018. On the first point, "[i]f the police lack probable

cause to believe that an object in plain view is contraband without conducting some further search of the object, that is, if its incriminating character is not immediately apparent, then the plain-view doctrine" does not excuse the lack of a warrant. 68 Am Jur 2d, Searches and Seizures, § 249, p 480. The speck of blood was not visible to the naked eye; it was only after a lab technician used a magnifying glass and filter-paper rubs that a blood stain was even suspected, and subsequent testing was needed to confirm that there was, in fact, a blood stain. Moreover, the fact that defendant, a vagrant, intravenous heroin addict, had a tiny speck of blood on his pants is not, in and of itself, particularly strong evidence of murder—especially this murder, where there was a significant amount of the victim's blood strewn about the crime scene, suggesting that the murderer would likely also have had a significant amount of blood on his or her person. Thus, even a plain view of the pants, augmented with a microscope and filter paper, did not suggest evidence of this particularly gruesome murder.

On the second point, with respect to the police's warrantless possession of the pants, our state's jurisprudence is unsettled. There are two decisions of our Supreme Court from several decades ago that suggest that a person does not lose all civil liberties related to his property merely because that property is in the possession of police and the person is being held on a charge unrelated to the one for which police are investigating. In *People v Carr*, 370 Mich 251, 253; 121 NW2d 449 (1963), our Supreme Court reviewed a defendant's appeal of his conviction of breaking-and-entering with the intent to commit larceny. The defendant had been pulled over for driving with a defective taillight, and he was arrested when unrelated stolen property was found during a subsequent search of the car. *Id*. The defendant pleaded guilty to possession of stolen property and was sentenced to 30 days in jail. *Id*. at 253-254. While serving that sentence, the defendant's car was stored in the jail's parking lot. *Id*. at 254.

Later, during his time in jail, the police decided to question the defendant about the breaking-and-entering at issue. *Id*. Defendant did not provide any useful information, so police performed a warrantless search of the defendant's car sitting in the jail's parking lot. *Id*. The police removed a monkey wrench from the car, took the car to a different county, evaluated tracks from the car's tires, and took paint from the car and wrench for further testing. *Id*. After conducting those tests, the defendant was charged and later convicted of breaking-and-entering with the intent to commit larceny. *Id*.

On whether the trial court should have suppressed the evidence, the Court concluded that the trial court erred, explaining:

> It could not be seriously urged that the search and seizure made by the officers without [the] defendant's consent or without a search warrant could not, nor likely would not, even have been attempted, had [the] defendant been at liberty and his automobile been parked on his own premises. [The d]efendant was not stripped of his civil rights and his constitutional safeguards merely because he was serving a sentence in the county jail for an unrelated misdemeanor. It would be a dangerous rule of law and an invitation to circumvent the constitutional guaranty against unreasonable search and seizure were the citizen convicted of a misdemeanor and in jail, possibly in default of payment of a fine, to be stripped of all his civil liberties. [*Id*.]

The Court focused on the police action of searching the defendant's car even when an interview of the defendant had not produced any probable cause for the search. *Id*. at 256. If the officer had obtained probable cause, then, the Court insisted, he should have obtained a warrant. *Id*. The Court concluded: "Here a search of the defendant's possession—his automobile was made without a search warrant, without cause, probable or otherwise related to the alleged crime, without any basis other than possibly understandable suspicion. Such search and seizure was made in patent violation of the State Constitution of 1908, art 2, § 10." *Id*. (footnote omitted).

In the end, the Court determined the evidence should have been suppressed, and because without it the defendant likely would not have been convicted, the Court reversed. *Id*. Importantly, our Supreme Court decided the case entirely on the basis of the Michigan Constitution, and even expressly refused to consider federal precedent when analyzing the issue: "In view of our holding under the State Constitution, neither the question of the applicability of *Mapp v Ohio*, [367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961)], nor the other allegations of error need be discussed." *Id.* at 256-257.

Eight years later, our Supreme Court considered a similar issue in *People v Trudeau*, 385 Mich 276; 187 NW2d 890 (1971). The defendant had been arrested on unrelated burglary charges, and an officer suspected that the defendant had been involved in a separate burglary that had led to a murder. The officer went to the courthouse during the defendant's preliminary examination on the unrelated charges. *Id*. at 278. A shoeprint had been found at the scene of the murder, so the officer asked the defendant to lift his feet so the officer could see the heel of the defendant's shoes. *Id*. The defendant complied, but subsequently refused to give the officer his shoes. *Id*. The officer took the shoes anyway, without a warrant. *Id*. After significant testing, an expert witness determined the defendant's shoes matched the heel print from the murder scene. *Id*. at 279-280.

The defendant was charged with murder, and he moved to suppress the evidence. *Id*. at 278. The argument was unsuccessful, the evidence was used against the defendant at trial, and he was convicted of murder. *Id*. at 278-279. Our Supreme Court subsequently granted leave to consider whether evidence related to the defendant's shoes should have been suppressed. *Id*. at 279.

As to the prosecutor's argument that the plain-view exception applied, the Court noted the police had not established probable cause to believe the shoes were connected to the murder until after the laboratory conducted its lengthy investigation. *Id*. at 280. This meant the police officer's plain view of the shoes had not amounted to probable cause to believe the shoes were related to the crime at issue. *Id*.

Next, the Court considered whether the defendant's incarceration at the time of the search and seizure changed the outcome. *Id*. Relying on *Carr*, the *Trudeau* Court held that the defendant "did not lose his civil rights or liberties while he was in police custody awaiting trial on another charge." *Id.* at 281. When *Trudeau* was decided, our current 1963 Constitution had been adopted and was in place. As in *Carr*, the *Trudeau* Court made sure to clarify it was not "in any way affecting essential steps which must be taken by the police in processing a prisoner . . . and to assure the protection of the police and of other prisoners." *Id*. The Court reversed the defendant's conviction and remanded for a new trial. *Id*.

The similarities between the present case, *Trudeau*, and *Carr*, are evident. Defendant was in jail on misdemeanor charges unrelated to the victim's murder. During that time, the police removed his pants from jail, sent them to a state laboratory, and conducted forensic testing on them. The police did so without a warrant. The tests were solely related to the victim's murder, not the other charges for which defendant had actually been jailed. Both the *Carr* and *Trudeau* Courts held the laboratory testing on the automobile from *Carr* and the shoes from *Trudeau* amounted to an unreasonable search.

Although neither *Carr* nor *Trudeau* has been overturned by our Supreme Court, one can legitimately ask whether there is much left of them beyond their specific facts. As the majority points out, the ground of Fourth Amendment jurisprudence has shifted considerably since *Carr* and *Trudeau* were decided. Moreover, although *Carr* explicitly relied only on the state Constitution, and *Trudeau* relied on *Carr*, it has been the general law of this state that the standard of reasonableness for searches and seizures is no higher under article 1, § 11 of our Constitution of 1963 than under the Fourth Amendment to the U.S. Constitution. *People v Carter*, 250 Mich App 510, 519-520; 655 NW2d 236 (2002). Panels of this Court have explicitly questioned the reach and viability of *Trudeau*, as the majority recognizes. See, e.g., *People v Bembeneck*, unpublished per curiam opinion of the Court of Appeals, issued January 20, 2022 (Docket No. 352919), slip op at 5 n 4.

Even so, with *Carr* and *Trudeau* remaining at least nominally the law of this state for now, I might well have dissented rather than concurred but for one decisive factor—the privacy interest at stake. Both the U.S. Supreme Court and our Supreme Court have held in recent years that warrantless searches, or searches beyond the scope of an existing warrant, of mobile devices and the like violate the Fourth Amendment. *Riley v California*, 573 US 373; 134 S Ct 2473; 189 L Ed 2d 430 (2014); *People v Hughes*, 506 Mich 512; 958 NW2d 98 (2020). In today's world, such a device holds access to a vast amount of private information about the device's owner. Had police obtained evidence in this case by accessing a mobile device of defendant without a warrant or permission—even if they had lawful possession of the device as part of their normal jailing procedures—such evidence would likely have been suppressed had defense counsel moved to do so.

What tips the scale in favor of affirming here, however, is that it was *the victim*'s blood on the surface of defendant's pants that was discovered through the DNA testing. Whether a defendant would have a legitimate privacy interest in his own blood on the surface of his own pants is an interesting question. Similarly, if the blood had not been found on the surface of the pants, but instead the search somehow required the pants to be ripped apart, raises yet another interesting question. Neither of these questions is before us here.

Rather, we have the blood of the victim, for which defendant does not have a legitimate privacy interest, found on the surface of defendant's pants, for which identification of the blood did not require *invasive search*, even if it required *extensive analysis*. Although I believe that this case presents a much closer call than does the majority, defendant's claim that the evidence would have been suppressed had a motion been made falls just short on the facts of this case. See *Sheffield v United States*, 111 A3d 611, 622 (DC App, 2015) (concluding that defendant did not have any legitimate expectation of privacy in victim's blood on his pants).

-5-

And yet, what makes this case remain unsettling in my view is the dearth of reliable evidence of defendant's guilt apart from the speck of the victim's blood found on his pants. The only other reliable evidence related to guilt was the evidence putting defendant in the general vicinity within a day or so of the crime. As noted earlier, however, this vicinity evidence was rather weak given that defendant had performed odd jobs for the victim in the recent past. Even the DNA evidence is not as strong as one would normally associate with such evidence, given other evidence that the victim was diabetic and often bled from her feet, and defendant had helped her in the past with household chores. While supposition, this equivocal evidence is likely what resulted in the hung jury in defendant's first trial. No other reliable evidence linked defendant with this crime, either directly or circumstantially. My colleagues see "a significant amount" of guilt in this record that I simply do not see, especially discounting, as I do, any notion that brushing one's legs is somehow to be taken seriously as evidence of deception.

With that said, because there does not appear to have been a clear ground for suppressing the DNA evidence, I agree with my colleagues that there was no plain error or ineffective assistance of counsel with respect to suppression of that evidence. Further, I agree with my colleagues that defendant's remaining claims on appeal do not warrant reversal.

Accordingly, I concur in affirming defendant's conviction, albeit I do so *dubitante*, given the unsettled nature of this state's search-and-seizure case law.

/s/ Brock A. Swartzle